PJM AND ASSOCIATES, LC *v.* CITY OF BRIDGEPORT

BRIDGEPORT TOWERS, LLC *v.* CITY
OF BRIDGEPORT
(SC 18229)

Rogers, C. J., and Norcott, Vertefeuille, Zarella and Schaller, Js.

126

Argued November 18, 2008—officially released June 16, 2009

*Russell D. Liskov,* associate city attorney, for the appellant (defendant).

*George J. Markley,* with whom was *Alexander Breiner,* for the appellees (plaintiffs).

*Opinion*

ZARELLA, J. The principal issue in this joint appeal is whether a municipal tax assessor, in determining the present value of real property used primarily for the purpose of producing rental income, has authority under General Statutes § 12-63c[1] to compel the filing of income and expense reports by the property owner in years in which there is no citywide revaluation or

[1] General Statutes § 12-63c provides in relevant part: "(a) In determining the present true and actual value in any town of real property used primarily for purposes of producing rental income, the assessor . . . shall have power to require, subject to the conditions in subsection (b) of this section, in the conduct of any appraisal of such property pursuant to the capitalization of net income method, as provided in section 12-63b, that the owner of such property annually submit or make available to the assessor not later than the first day of June, on a form provided by the assessor, the best available information disclosing the actual rental and rental-related income and operating expenses applicable to such property.

"(b) Any such information related to actual rental and rental-related income and operating expenses and not already a matter of public record which is submitted or made available to the assessor shall not be subject to the provisions of section 1-210.

"(c) If upon receipt of information as required under subsection (a) of this section the assessor finds that such information does not appear to reflect actual rental and rental-related income or operating expenses related to the current use of such property, additional verification concerning such information may be requested by the assessor. Any person claiming to be aggrieved by the action of the assessor hereunder may appeal the actions of the assessor to the board of assessment appeals and the Superior Court as otherwise provided in this chapter.

"(d) Any owner of such real property required to submit or make available information to the assessor in accordance with subsection (a) of this section for any assessment year, who fails to submit such information or fails to make it available as required under said subsection (a) or who submits information or makes it available in incomplete or false form with intent to defraud, shall be subject to a penalty assessment equal to a ten per cent increase in the assessed value of such property for such assessment year."

interim revaluation of properties in the same class as the owner's property. The defendant, the city of Bridgeport, appeals[2] from the judgments of the trial court reversing the decisions of the defendant's board of assessment appeals (board) upholding penalties imposed by the defendant's tax assessor (assessor) on the plaintiffs, PJM and Associates, LC (PJM), and Bridgeport Towers, LLC (Bridgeport Towers), owners of income producing properties[3] in Bridgeport, for failing to comply with the assessor's request to file reports disclosing the rental income and operating expenses of the properties by June 1, 2004. The defendant specifically claims that the trial court improperly determined that § 12-63c (a) does not authorize the assessor to compel the disclosure of information regarding income and operating expenses in a year when there is no citywide revaluation of all real property or no interim revaluation of properties in the same class as the plaintiffs' properties. The plaintiffs reply that the trial court properly construed the statute and claim as alternate grounds for affirmance[4] that (1)

[2] The defendant appealed to the Appellate Court from the judgments of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The property owned by Bridgeport Towers is an apartment building, whereas the property owned by PJM is a leased manufacturing facility.

[4] Practice Book § 63-4 (a) provides in relevant part: "At the time the appellant sends a copy of the endorsed appeal form and the docket sheet to the appellate clerk, the appellant shall also send the appellate clerk an original and one copy of the following:

"(1) A preliminary statement of the issues intended for presentation on appeal. If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed . . . that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues.

"Whenever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue. . . ."

In this case, the plaintiffs filed a statement of alternate grounds on which to affirm the trial court's judgments, but the appellate clerk's office returned the statement because it had been filed without the permission of the Appellate Court, before which the plaintiffs' joint appeal then was pending. The plaintiffs did not thereafter file a motion seeking permission. The plaintiffs,

the plaintiffs had no intent to defraud, the only circumstance under which the statutory penalty may be imposed for a property owner's failure to submit an income and expense report, (2) the penalty bears no rational relationship to the offense, (3) § 12-63c (a) empowers the assessor to require an income and expense report only when a property is appraised under the capitalization of net income method, which was unwarranted in these cases under General Statutes § 12-63b (a), and (4) the assessor incorrectly calculated PJM's penalty by increasing by 10 percent the prior assessed value of its industrial facility, instead of its value following application of the exemption under General Statutes § 12-81 (59) for a manufacturing facility in a distressed municipality. We conclude that the trial court's judgments must be reversed because the assessor was authorized under § 12-63c (d) to impose penalties on the plaintiffs for failing to file the requested income and expense reports by June 1, 2004. We further conclude that the plaintiffs' first and second alternate grounds for affirmance have no merit. We agree, however, with the plaintiffs' third alternate ground for affirmance, namely, that § 12-63b (a) empowers the assessor to require income and expense reports only when there are insufficient data regarding current sales of comparable properties.[5] Accordingly, we reverse the trial court's judgments and remand the cases to the trial court for further proceedings to determine whether there were insufficient data on comparable sales so as

however, had briefed the issues that they raised as alternate grounds for affirmance in their briefs to the trial court. Accordingly, they did not need permission to raise the same issues on appeal to the Appellate Court or this court.

[5] The issue of whether there were insufficient data regarding comparable sales was raised at trial, but the parties agreed to defer the issue until after the court found that the assessor had authority to impose the penalties pursuant to § 12-63c (d). The trial court never decided the issue in light of its conclusion that the assessor had no authority to impose the penalties under § 12-63c (d).

to justify the assessor's use of the capitalization of net income method, and, if there were insufficient data, to consider the plaintiffs' claim that the assessor improperly calculated the penalty against PJM's tax-exempt property.

The parties stipulated to the following facts. The defendant sent each plaintiff a questionnaire regarding income and expenses in connection with their rental properties for the Bridgeport grand list of October 1, 2004. Neither party received the questionnaire, however, and, for that reason, neither party filed a completed questionnaire with the assessor by June 1, 2004. Thereafter, the assessor imposed penalties on the plaintiffs pursuant to § 12-63c (d) for their failure to file the questionnaire by June 1, 2004. The penalties consisted of an increase in the assessed value of each property by 10 percent for the assessment year October 1, 2004. The penalty imposed on the property owned by PJM was based on the property's original assessed value as reflected on the grand list of October 1, 2004, instead of on the reduced assessed value applicable to the property on the grand list of October 1, 2004, under § 12-81 (59).[6] Both plaintiffs filed timely appeals to the board

---

[6] General Statutes § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:

\* \* \*

"(59) Manufacturing facility in a distressed municipality, targeted investment community or enterprise zone. Designated manufacturing plant. Service facility. (a) Any manufacturing facility, as defined in section 32-9p, acquired, constructed, substantially renovated or expanded on or after July 1, 1978, in a distressed municipality, as defined in said section or in a targeted investment community, as defined in section 32-222, or in an enterprise zone designated pursuant to section 32-70 and for which an eligibility certificate has been issued by the Department of Economic and Community Development, and any manufacturing plant designated by the Commissioner of Economic and Community Development under subsection (a) of section 32-75c as follows: To the extent of eighty per cent of its valuation for purposes of assessment in each of the five full assessment years following the assessment year in which the acquisition, construction, renovation or expansion of the manufacturing facility is completed, except that a manufacturing facility having a standard industrial classification code of 2833 or

from the assessor's decisions, and the board subsequently denied the appeals.

The plaintiffs appealed from the board's denial of their appeals to the trial court. At trial, the assessor, William O'Brien, testified that income and expense reports for the plaintiffs' properties had been filed in the years 2003, 2005 and 2006. He also testified that a citywide revaluation had been conducted in 2003 and that, although there had been a revaluation of a class of commercial properties in 2004 that did not include the plaintiffs' properties, there had been no citywide revaluation of properties in 2004, 2005 or 2006. The assessor further testified that, even if the plaintiffs had submitted the requested income and expense reports after June 1, 2004, the penalties would have been imposed for their failure to file them by the deadline.

The trial court sustained the appeals and rendered judgments for the plaintiffs. The trial court first observed that an assessor is not limited to appraising real property only in a year of a citywide revaluation, as the plaintiffs contended, because General Statutes § 12-55[7] permits assessors to conduct interim revaluations. E.g., *DeSena* v. *Waterbury*, 249 Conn. 63, 91, 731 A.2d 733 (1999). The court nonetheless concluded that, "unless the assessor demands . . . income and expense figures from the property owner during the process of revaluation, for purposes of determining the

2834 and having at least one thousand full-time employees, as defined in subsection (f) of section 32-9j, shall be eligible to have the assessment period extended for five additional years upon approval of the commissioner, in accordance with all applicable regulations, provided such full-time employees have not been relocated from another facility in the state operated by the same eligible applicant . . . ."

[7] General Statutes § 12-55 (b) provides in relevant part: "The assessor or board of assessors may increase or decrease the valuation of any property as reflected in the last-preceding grand list, or the valuation as stated in any personal property declaration or report received pursuant to this chapter. . . ."

present true and actual value of the property, there is no statutory obligation for the property owner to file such information annually." The court thus determined that, because the assessor had acknowledged at trial that there had been no citywide revaluation and no revaluation for the class of properties to which the plaintiffs' properties belonged in 2004, the information requested from the plaintiffs would not have been used for the purpose, set forth in the statute, of conducting a *contemporaneous* appraisal of the properties to determine their present value in 2004. The court specifically concluded that "[§] 12-63c (a) is not a statute that authorizes an ongoing yearly submission, but rather it has the specific purpose of aiding an assessor in the process of conducting a 'present' valuation of a taxpayer's property for assessment purposes." The court thus nullified the penalties imposed by the assessor, and this appeal followed.

"An appellate court's review of a trial court decision is circumscribed by the appropriate standard of review. As we have often stated: The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 118–19, 733 A.2d 817 (1999).

In the present case, the defendant claims that the assessor had authority under § 12-63c to request the income and expense reports, thus raising an issue of statutory interpretation that requires our plenary

review.[8] See, e.g., *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 676–77, 911 A.2d 300 (2006). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 677. "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *R.C. Equity Group, LLC* v. *Zoning Commission*, 285 Conn. 240, 266, 939 A.2d 1122 (2008).

I

We begin with the defendant's claim that the assessor had authority to require the submission of income and

[8] We disagree with the plaintiffs that the clearly erroneous standard is applicable in this case merely because the Appellate Court applied that standard in *NSA Properties, Inc.* v. *Stamford*, 100 Conn. App. 262, 917 A.2d 1034 (2007), and *Cadlerock Properties Joint Venture, L.P.* v. *Ashford*, 98 Conn. App. 556, 909 A.2d 964 (2006). In *NSA Properties, Inc.*, the Appellate Court was not required to interpret the language of a statute but, rather, to determine whether there was sufficient evidence to support the trial court's finding that the subject property was used exclusively for charitable purposes. See *NSA Properties, Inc.* v. *Stamford*, supra, 268–69. *Cadlerock Properties Joint Venture, L.P.*, also is distinguishable. Although the Appellate Court in that case ultimately concluded that the trial court's decision was not clearly erroneous; see *Cadlerock Properties Joint Venture, L.P.* v. *Ashford*, supra, 564; the Appellate Court applied principles of statutory interpretation in considering initially whether the plaintiff's property had been properly valued. See id., 561–63.

expense reports for the 2004 tax year, in which a revaluation of the plaintiffs' properties did not occur. General Statutes § 12-63c (a) provides in relevant part: "In determining the present true and actual value in any town of real property used primarily for purposes of producing rental income, the assessor . . . shall have power to require . . . in the conduct of any appraisal of such property pursuant to the capitalization of net income method, as provided in section 12-63b, that the owner of such property *annually submit* or make available to the assessor not later than the first day of June, on a form provided by the assessor, the best available information disclosing the actual rental and rental-related income and operating expenses applicable to such property." (Emphasis added.)

The language of the statute is plain and unambiguous. The assessor is granted authority to require that the owners of income producing property "*annually submit*" income and expense reports "in the conduct of any appraisal of such property" under the capitalization of net income method. (Emphasis added.) General Statutes § 12-63c (a). The only implied restriction in the statute is that the assessor may not require reports more than once each year. Moreover, § 12-62i-4 (a) of the Regulations of Connecticut State Agencies provides in relevant part that, "[p]rior to finalizing a revaluation, the assessor and the company, if any, employed by the town, shall . . . (3) . . . (D) [maintain] [a] file of income and expense statements submitted in accordance with section 12-63c of the . . . General Statutes *for the two-year period prior to the assessment date that is the effective date of a revaluation . . . .*" (Emphasis added.) The regulation, which has the same force and effect of law as the statute;[9] e.g., *Griffin*

[9] General Statutes § 12-62 (g) provides in relevant part: "The secretary [of the office of policy and management] shall adopt regulations, in accordance with the provisions of chapter 54, which an assessor shall use when conducting a revaluation. . . ."

*Hospital* v. *Commission on Hospitals & Health Care*, 200 Conn. 489, 497, 512 A.2d 199 ("the validly enacted regulations of an administrative agency carry the force of statutory law"), appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986); thus reinforces the statute's plain and unambiguous language granting the assessor the power to require income and expense reports in years in which there is no revaluation of the properties.[10] The fact that the trial court concluded that there would be no reason to require the reports in years in which the assessor was not conducting a contemporaneous appraisal for revaluation purposes does not mean that the statute is *not* plain and unambiguous but merely that the court followed its own logic without recognizing that the statute and the applicable regulation both refer to the assessor's authority to require reports in other years as well. Accordingly, we conclude that the assessor had authority under § 12-63c (a) to require the plaintiffs to submit income and expense reports by June 1, 2004, regardless of the fact that 2004 was not a revaluation year.[11]

The plaintiffs argue that "[t]he only issue is how often the assessor can require taxpayers to submit such infor-

[10] Although the regulation refers to the filing of income and expense statements that have been submitted during the "two-year period" prior to the effective date of a revaluation; Regs., Conn. State Agencies § 12-62i-4 (a) (3) (D); it does not limit the assessor's authority to require *annual* reports because it also refers to the reports required "in accordance with [§] 12-63c of the . . . General Statutes . . . ." Id. In other words, the statute, which authorizes the assessor to require the submission of annual reports, is not in any way limited by the regulation, which requires an assessor to maintain a file of any reports submitted in the two year period preceding the effective date of a revaluation.

[11] The parties also argue that a comparison of the present and former language of the statute prior to its amendment in 1997; compare General Statutes (Rev. to 1997) § 12-63c with Public Acts 1997, No. 97-254, § 3; and the statute's legislative history support their respective positions. We need not consider the statute's legislative history, however, in light of the statute's clear and unambiguous language.

mation," but they inexplicably ignore the word "annually" in the statute and fail to mention or acknowledge the regulation. Instead, they contend that other language in § 12-63c (d) providing that any property owner "required" to submit information "for any assessment year" who fails to do so or who does so fraudulently shall be subject to a penalty calculated on the basis of the assessed value of the property "for such assessment year," clearly demonstrates that the assessor lacked authority to require income and expense reports for 2004 because 2004 was not a revaluation year for which appraisals were "required." This claim has no merit.

General Statutes § 12-62 (a) (5) defines the terms "revaluation" and "revalue" as follows: "[T]o establish the present true and actual value of all real property in a town as of a specific assessment date . . . ." Thus, a revaluation year is a year in which a revaluation occurs. In contrast, this court has explained that an assessment year "commences on the first day of October . . . [and] is the time period for which a property owner is liable for property taxes. See General Statutes § 12-172 (municipal tax liens exist from the first day of October . . . in the year previous to that in which such tax, or the first installment thereof, became due) . . . ." (Citation omitted; internal quotation marks omitted.) *Interlude, Inc.* v. *Skurat*, 266 Conn. 130, 141, 831 A.2d 235 (2003); see also General Statutes § 12-81 (74) (C) (defining term "assessment year" as "the period of twelve full months commencing with October first each year"). In other words, an assessment year is "the period for which taxes have accrued . . . ." *Interlude, Inc.* v. *Skurat*, supra, 141. Accordingly, each year is an assessment year because taxes accrue each year, but only some years are revaluation years. Considered in this context, the references in § 12-63c (d) to "any assessment year" and to "such assessment year" are intended to mean that property owners may be penal-

ized if they fail to submit or fraudulently submit the information requested by the assessor in any particular assessment year, regardless of whether it is a revaluation year. We see absolutely no way to construe the statute in any other manner.

The plaintiffs nevertheless argue that, because §§ 12-63b (a) and 12-63c (a) allude to the necessity of using various valuation methods and obtaining income and expense information, respectively, for the purpose of "determining the present true and actual value" of rental income property, the assessor has authority to require such information only in revaluation years in which the property is being appraised. We disagree.

"It is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Citations omitted; internal quotation marks omitted.) *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008). Correspondingly, "[w]hen a court interprets [a statute], it cannot change the inherent meaning of words or supply additional terms to change the meaning of the provision at issue. See *Testa* v. *Geressy*, 286 Conn. 291, 308, 943 A.2d 1075 (2008) ([t]he process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . .); *Lucarelli* v. *State*, 16 Conn. App. 65, 70, 546 A.2d 940 (1988) ([c]ourts must interpret statutes as they are written . . . and cannot, by judicial construction, read into them provisions which are not clearly stated . . .)." (Internal quotation marks omitted.) *State*

v. *DeJesus*, 288 Conn. 418, 501, 953 A.2d 45 (2008) (*Katz, J.*, dissenting).

As we previously observed, there is no language in the statute limiting the assessor's ability to require income and expense reports to revaluation years. Moreover, the plaintiffs completely ignore language *expressly providing* that the assessor may require the submission of such reports "annually . . . ." General Statutes § 12-63c (a). This court simply cannot interpret the statute *as if* it limits the assessor's authority to request reports to revaluation years when the statute plainly provides otherwise.

The plaintiffs next assert that language in § 12-63b (b) describing the factors to be considered under the capitalization of net income approach to valuation, such as "present rentals,"[12] also demonstrates that income and expense reports may be required only in revaluation years in which comprehensive appraisals are conducted. We disagree.

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value. Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992) p. 409." (Internal quotation marks omitted.) *First Bethel Associates* v. *Bethel*, 231 Conn. 731, 739, 651 A.2d 1279 (1995).

Under this method, § 12-63b (a) requires the use of "market rent" as the indicator of income. General Statutes § 12-63b (b) defines "market rent" as "the rental

---

[12] General Statutes § 12-63b (b) defines the term "market rent" as "the rental income that [rental] property would most probably command on the open market as indicated by *present rentals* being paid for comparable space." (Emphasis added.)

income that [rental] property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination." "Market rent" under § 12-63b (b) thus is calculated by examining the "(1) net rent for comparable properties, and (2) the net rent derived from existing leases on the property." *First Bethel Associates* v. *Bethel,* supra, 231 Conn. 740.

The plaintiffs claim that the statute's use of the terms "present rentals" in referring to comparable properties, and "actual rental income . . . under the terms of an existing . . . lease at the time of such determination" in referring to the property owner's lease; General Statutes § 12-63b (b); suggests that the assessor may require income and expense reports only in revaluation years. The plaintiffs, however, adopt an unduly narrow construction of § 12-63b (b). What the plaintiffs fail to consider is that the income and expense reports from the years preceding a revaluation may assist the assessor in conducting an appraisal of a property's present value by identifying trends in the market rent that may affect the ultimate determination of that value. Annual reports also may assist the assessor in identifying anomalies in existing leases, some of which may not reflect the current "market rent" because of unusual circumstances surrounding the parties' lease agreement. It is thus not unreasonable, nor does it yield an "absurd or unworkable result," for the assessor to require income and expense reports in years in which there is no revaluation.[13] Accordingly, we conclude that the trial court

---

[13] The plaintiffs' contention that interim changes in the market value of real property are not grounds for reassessment has no bearing on our analysis. Our point is simply that trends in market rentals may be significant in determining the property's present value during a revaluation year because they either may justify or call into question the significance of older leases that were signed in years when rentals were higher or lower.

improperly determined that the assessor was not empowered to impose penalties on the plaintiffs for their failure to file the requested income and expense reports by June 1, 2004.

## II

The plaintiffs raise four alternate grounds for affirmance, one relating to the assessor's authority to require the reports under the capitalization of net income method when there are insufficient data concerning comparable sales, two relating to the validity of the penalties, and one relating to the improper calculation of the penalty assessed against tax-exempt property owned by PJM. We begin with the claims involving the validity of the penalties because, if the penalties improperly were imposed for reasons unrelated to the assessor's authority to do so, there will be no need to address the claims regarding the insufficient data concerning comparable sales and the improper calculation of the penalty.

## A

The plaintiffs' first alternate ground for affirmance is that the assessor improperly imposed the penalty set forth in § 12-63c (d) because their failure to submit the income and expense reports was not the result of an intent to defraud but, rather, was caused by the fact that they did not receive the questionnaires on which the information was to be provided. This claim is without merit.

General Statutes § 12-63c (d) provides in relevant part: "Any owner of . . . real property required to submit or make available information to the assessor in accordance with subsection (a) of this section for any assessment year, who fails to submit such information or fails to make it available as required under said subsection (a) or who submits information or makes

it available in incomplete or false form with intent to defraud, shall be subject to a penalty assessment equal to a ten per cent increase in the assessed value of such property for such assessment year."

The plaintiffs' counsel declared, in responding to a question during oral argument before this court, that the phrase "with intent to defraud" was intended to apply to all of the circumstances enumerated in the statute, including a failure to submit the information or to make it available, and the submission of incomplete or false information. He specifically argued that the phrase was intended to apply in the present circumstances because the statute lacked a comma separating the clause pertaining to the failure to submit or make the information available from the clause pertaining to the submission of incomplete or false information, and because it would be illogical to impose such a penalty on a property owner for the mere failure to submit or to make the information available. We disagree.

Section 12-63c (d) is divided into two distinct parts, each of which begins with the word "who," and each of which defines the circumstances under which the penalty may be imposed. Under the first part of the statute, a penalty may be imposed if the required information never reaches the assessor because the property owner does not provide the information or make it available. Under the second part, a penalty may be imposed if the property owner submits incomplete or false information. The phrase "with intent to defraud" applies to the second part of the statute because it directly follows the statute's reference to the submission of the information in "incomplete or false form . . . ." General Statutes § 12-63c (d).

There can be no other reasonable interpretation of the statute because the word "defraud" means "[t]o make a misrepresentation of an existing material fact,

knowing it to be false or making it recklessly without regard to whether it is true or false, intending one to rely and under circumstances in which such person does rely to his damage." Black's Law Dictionary (6th Ed. 1990). "Misrepresentation" is defined in relevant part as "[a]ny manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts. . . ." Id. Thus, an intent to defraud cannot be attributed to a property owner who fails to submit information because failing to act is the opposite of assertive conduct. By contrast, an intent to defraud properly may be attributed to a property owner who supplied the assessor with incomplete or false information because the owner took affirmative steps to give the assessor information that was in some way deficient. Regardless of whether one deems the failure to submit or make the information available a less egregious violation of the statute than the submission of information with intent to defraud, the effect is the same: the assessor does not receive the correct information on which to calculate the property owner's taxes for the assessment year. Accordingly, the foregoing interpretation of the statute as consisting of two distinct parts does not yield absurd or unworkable results.

In the present case, the parties stipulated that the plaintiffs did not submit the information because they did not receive the questionnaire. Thus, there is no possibility that they had an intent to defraud under the statute, and we must reject their claim that the penalties should not have been imposed for that reason.

B

The plaintiffs next claim that the trial court's judgment should be affirmed because the penalties bear no rational relationship to the offense. They contend that the imposition of a penalty equal to a 10 percent

increase in the assessed value of the property for the assessment year in which the offense occurs results in a significantly greater penalty for a property with a higher assessed value than for a property with a lower assessed value. They further argue that this disparity in the magnitude of the penalty is unrelated to the extent of the property owner's failure to comply with the disclosure requirements, the owner's reason for failing to comply with the requirements, and the ability of the owner to pay the penalty. To illustrate the disparate effect of the rule in this case, they note that the penalty imposed on PJM was approximately $7000, whereas the penalty imposed on Bridgeport Towers was more than $28,000, even though both plaintiffs failed to submit the information for precisely the same reason, namely, that they did not receive the questionnaire from the assessor.

The plaintiffs' brief contains approximately one page of facts and argument but no citation to any case law or other legal authority. Despite this dearth of legal analysis, we consider the plaintiffs' argument and conclude that the effect of a penalty need not be equal. In *Darien* v. *State*, 141 Conn. 336, 106 A.2d 181 (1954), we observed that "the intent of the legislature in enacting [an estate penalty tax] was to punish those persons who had evaded the tax duty which they owed . . . ." Id., 346. "The theory of the tax was that it was not so much a revenue producer as a penalty imposed for a failure on the part of the decedent to comply with the law during his lifetime. As we said in *Bankers Trust Co.* v. *Blodgett*, 96 Conn. 361, 366, 114 A. 104 [1921]: 'The pecuniary liability imposed by [the statute] is a penalty in the nature of a tax for an omission to list property for taxation. Punishment is the end of a penalty. . . . The wrong sought to be redressed by this tax is a wrong which has been done [to] the public treasury. The necessities of government give the [s]tate

the right to tax property for such purposes and in such amounts as it may determine . . . and with the power to tax must go the power to enforce collection of the tax by all summary means not contrary to the [c]onstitution, and one of those means is the right to impose penalties in order to compel payment and as a punishment for evasion or neglect of this duty owed the public.' " *Darien* v. *State*, supra, 347.

The purpose of the penalty in the present case is to compel the submission of information to assist the assessor in performing his duties. The fact that some property owners are subjected to a higher penalty than others is not unreasonable. Because the tax obligation and the potential loss of revenue due to an incorrect assessment are greater when a property is more valuable, it is reasonable to impose higher penalties on the owners of such properties. Finally, with respect to the magnitude of the penalty, we have stated that "penalty provisions in taxing statutes are quite common and . . . such provisions, though often attacked as confiscatory, are almost always upheld by the courts." *Brittany Farms Health Center, Inc.* v. *Administrator, Unemployment Compensation Act*, 177 Conn. 384, 386–87, 418 A.2d 52 (1979); see also *Western Union Telegraph Co.* v. *Indiana*, 165 U.S. 304, 307, 309–10, 17 S. Ct. 345, 41 L. Ed. 725 (1897); *Bankers Trust Co.* v. *Blodgett*, supra, 96 Conn. 366. "In *Hartford Fire Ins. Co.* v. *Brown*, 164 Conn. 497, 325 A.2d 228 (1973), for example, this court upheld the validity of a statute which resulted in a penalty of $320,000 for a tax payment that was made one or two days late." *Brittany Farms Health Center, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 387. We therefore conclude that the plaintiffs' claim is not persuasive.

C

Having determined that the penalties are not invalidated on grounds unrelated to the assessor's authority,

which would have made consideration of the plaintiffs' other claims unnecessary, we now turn to the two remaining alternate grounds for affirmance. The first is that, even if the assessor has the authority to require income and expense reports, which are used in determining property values under the capitalization of net income method, he could not require the reports in this case because §§ 12-63b (a) and 12-63c (a) empower the assessor to employ the income method only when there are insufficient data on comparable sales, and there was no indication that such data were unavailable when the assessor requested the reports. We agree with the plaintiffs that the statute does not permit the assessor to use the capitalization of net income method unless there are insufficient data on comparable sales. Because the parties agreed, however, to defer this issue until after the trial court decided whether the assessor was authorized to impose penalties on the plaintiffs for failing to submit the reports, the court did not reach the issue of comparable sales after initially deciding that the assessor had no authority to impose the penalties. We therefore conclude that the case must be remanded to the trial court for an evidentiary hearing on this issue.

The following additional facts are relevant to our analysis. At trial, the plaintiffs' attorney, George J. Markley, informed the court that an appraiser was prepared to testify that, because there were sufficient data available regarding sales of comparable properties, the assessor had no authority to use the capitalization of net income method and to require submission of the income and expense reports necessary to perform the analysis. Markley further stated, however, that the parties had agreed first to brief the legal issue of whether the statute limits the assessor to utilization of the comparable sales method if sufficient data on comparable sales are available. Markley then stated that only if

the court determined that the plaintiffs' arguments on statutory interpretation had no merit would each side present the testimony of their respective appraisers to determine whether there were insufficient data on comparable sales to justify the assessor's use of the capitalization of net income method. Counsel for the defendant confirmed that the parties had agreed to this approach, and the court took notice of the agreement.[14]

General Statutes § 12-63c (a) provides in relevant part: "[T]he assessor . . . shall have power to require . . . in the conduct of any appraisal . . . pursuant to the capitalization of net income method, as provided in section 12-63b, that the [property] owner . . . annually submit or make available to the assessor not later than the first day of June . . . [income and expense reports]." General Statutes § 12-63b (a), which concerns the valuation of rental income real property, provides

---

[14] After listening to counsel discuss the legal issue of whether § 12-63b (a) limited the assessor to using the comparable sales method if there were sufficient data available and whether testimony should be heard on the claim that there were insufficient data on comparable sales so as to permit the assessor to use the capitalization of net income method, the court conducted the following colloquy:

"The Court: Then why don't we just brief that legal issue first?

"[The Plaintiffs' Counsel]: That's what our intent is.

"[The Defendant's Counsel]: Right. That's what we're—

"The Court: Then do we need the testimony of [the plaintiffs' appraiser]?

"[The Plaintiffs' Counsel]: Not today, Your Honor.

"[The Defendant's Counsel]: Not today. That's why we came to that agreement.

"The Court: Well, I understand [that] the position of [the defendant's counsel] is to hear an appraiser without having an opportunity to have his own appraiser rebut whatever the testimony is, if he intends to do that. So why don't we then . . . receive—the court will receive briefs from both sides on that legal issue. Is that the way we're going?

* * *

"[The Plaintiffs' Counsel]: Correct.

"The Court: And depending [on] which way that comes out, you can either put further evidence on, or you can take an appeal of the court's decision on the legal issue?

"[The Plaintiffs' Counsel]: Correct, Your Honor."

in relevant part: "The assessor . . . when determining the present true and actual value of real property as provided in section 12-63, which property is used primarily for the purpose of producing rental income . . . and *with respect to which property there is insufficient data in such town based on current bona fide sales of comparable property which may be considered in determining such value,* shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property." (Emphasis added.)

Section 12-63b (a) provides that, when there are insufficient data on comparable sales, the assessor then shall consider, to the extent applicable, the capitalization of net income and two other appraisal methods in determining the value of rental property. In other words, the assessor is not authorized under the statute to use the capitalization of net income method unless there are insufficient data on comparable sales.[15] See *Sheridan* v. *Killingly,* 278 Conn. 252, 265–66, 897 A.2d 90 (2006) ("[§] 12-63b [a] expressly provides that the income capitalization approach may be used to appraise rental income property when *'there [are] insufficient data . . .* based on current bona fide sales of comparable

---

[15] We note that § 12-62i-4 (a) (3) (F) (viii) of the Regulations of Connecticut State Agencies provides that, "[f]or each commercial or special use property, the income and/or direct sales comparison appraisal methodology should be used for valuation purposes. The cost approach may be used if, in the [judgment] of the assessor, insufficient comparable market sales or income data exist for revaluation purposes." In the present case, neither property is a commercial or special use property. See footnote 3 of this opinion. Accordingly, the capitalization of net income approach can be used only if there are insufficient data on comparable sales.

property which may be considered in determining such value' " [emphasis added]); *Aetna Life Ins. Co.* v. *Middletown*, 77 Conn. App. 21, 32–33, 822 A.2d 330 ("[§ 12-63b] provides that *when an assessment on the basis of comparable sales is not feasible*, the city's assessor or board of assessors should conduct an appraisal, which shall include to the extent applicable . . . consideration of [several other] methods of appraisal" [emphasis added]), cert. denied, 265 Conn. 901, 829 A.2d 419 (2003); *Heather Lyn Ltd. Partnership* v. *Griswold*, 38 Conn. App. 158, 161–62, 659 A.2d 740 (1995) ("§ 12-63b [a] provides for . . . three [other] methods of appraisal to be considered when determining the present true and actual value of real property for tax assessment *in the absence of comparable sales*" [emphasis added]).

We conclude that, in light of the parties' agreement to defer the plaintiffs' claim regarding comparable sales pending the trial court's resolution of the penalty claim and this court's determination that the assessor had authority to impose penalties for the plaintiffs' failure to submit income and expense reports, the case must be remanded to the trial court for an evidentiary hearing to determine whether there were insufficient data on comparable sales to justify the assessor's decision to use the capitalization of net income method and his subsequent request for the income and expense reports.

D

The plaintiffs' last alternate ground for affirmance is that the assessor incorrectly calculated the penalty on PJM's tax-exempt property. We decline to review this claim. If the trial court determines that there were sufficient data on comparable sales and that the assessor was not authorized to use the capitalization of net income method, there will be no need to consider whether the penalty imposed on PJM's tax-exempt property was correct because the assessor could not

have required the reports or imposed a penalty for the plaintiffs' failure to submit them. If, however, the trial court determines that the assessor was authorized to use the capitalization of net income method and to request the reports, the question of whether the penalty was properly calculated will become relevant and should be addressed by the court at that time.

The judgments are reversed and the cases are remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.