SERAMONTE ASSOCIATES, LLC *v.*
TOWN OF HAMDEN
(SC 20571)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Alexander, Js.

*Syllabus*

Pursuant to statute (§ 12-63c (a)), an owner of real property used primarily
for the purpose of producing rental income may be required to "annually
submit to the assessor not later than the first day of June" certain income
and expense information for such property.

Pursuant further to statute (§ 12-63c (d)), an owner who fails to submit the
information required by § 12-63c (a) "shall be subject to a penalty equal
to a ten per cent increase in the assessed value of such property for
such assessment year."

The plaintiff, who owns certain real property in the town of Hamden,
appealed to the trial court from the decision of the defendant town's
board of assessment appeals, which upheld the assessment, pursuant
to § 12-63c (d), of a 10 percent penalty against the plaintiff's property
for the plaintiff's purportedly late submission of certain 2015 income
and expense information pursuant to § 12-63c (a). The plaintiff had
mailed the information on May 31, 2016, but the assessor did not receive
it until June 2, 2016, one day after the June 1 deadline set forth in § 12-
63c (a). The trial court upheld the board's decision, granted the town's
motion for summary judgment, and rendered judgment for the town,
concluding that the penalty was not improperly imposed because the
word "submit," as used in § 12-63c (a), required that the assessor receive
the information by June 1. The Appellate Court affirmed the trial court's
judgment, concluding that, when viewed in the context of other tax
statutes, the use of the word "submit" in § 12-63c (a) unambiguously
required delivery of the information to the assessor by June 1. On the
granting of certification, the plaintiff appealed to this court, claiming,
inter alia, that the term "submit" in § 12-63c (a) means "to send" and
that the Appellate Court, therefore, incorrectly had concluded that the
term "submit" required that the assessor receive the income and expense
information by June 1.

*Held* that the Appellate Court correctly concluded that the word "submit,"
as used in § 12-63c (a), required that the assessor receive the plaintiff's
income and expense information by June 1, and, accordingly, the asses-
sor's imposition of the 10 percent penalty under § 12-63c (d) was not
improper:

Seramonte Associates, LLC *v.* Hamden

Because the word "submit" was not defined in § 12-63c (a) or in the broader statutory scheme, this court looked to dictionary definitions in order to understand its ordinary meaning, and those definitions indicated that the process of submission is not considered complete in many contexts until the information is delivered to the recipient, and a reading of § 12-63c as a whole confirmed that the legislature's use of "submit" in the context of that statute unambiguously required the receipt, rather than the mere sending, of the income and expense information by June 1.

Although the plaintiff claimed that the fact that subsection (c) of § 12-63c used the word "receipt" and subsections (a) and (d) of that statute used "submit" suggested that the legislature must have intended those two words to have different meanings, a closer reading of § 12-63c (c) supported the opposite conclusion, as the phrase "receipt of information" in § 12-63c (c) is followed directly by the phrase "as required under subsection (a)," thus indicating that § 12-63c (a) requires receipt rather than mere sending.

Construing the word "submit" to require receipt of the information produced a more harmonious result with this court's case law suggesting that the common usage of the word "submit" contemplates not only transmission but receipt, as well, and a conclusion that § 12-63c (a) requires only sending or postmarking the information by June 1 could lead to unworkable results insofar as it would place the burden on the assessor to locate any information that is delayed or lost in the mail and would provide no incentive to the property owner to assist in locating or replacing such missing information.

In the present case, the plaintiff did not "submit" its income and expense information to the assessor when it placed that information in the hands of the postal service on May 31, 2016, but, rather, the process of submission was complete only when the assessor received the information on June 2, 2016, one day after the statutory deadline imposed by § 12-63c (a).

(*Two justices concurring separately in one opinion*)

Argued May 4—officially released October 18, 2022

*Procedural History*

Appeal from the decision of the defendant's board of assessment appeals denying the plaintiff's appeal from a penalty imposed by the defendant's assessor and added to tax assessments on certain of the plaintiff's real properties, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the court, *S. Richards, J.*, granted the defendant's motion for summary judgment and motion to strike,

Seramonte Associates, LLC *v.* Hamden

denied the plaintiff's motion for summary judgment, and rendered judgment for the defendant, from which the plaintiff appealed to the Appellate Court, *Bright, C. J.*, and *Alvord* and *Oliver, Js*., which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed*.

*Brenden P. Leydon*, for the appellant (plaintiff).

*Zachary J. Phillipps*, with whom, on the brief, was *Adam J. Blank*, for the appellee (defendant).

*Opinion*

KAHN, J. The sole question in this certified appeal is whether General Statutes § 12-63c (a), which requires the owners of certain rental property to "submit" income and expense information to their municipal tax assessor "not later than the first day of June," is satisfied when that information is postmarked but not delivered by that date. The plaintiff, Seramonte Associates, LLC, appeals from the judgment of the Appellate Court, which affirmed the judgment of the trial court rendered in favor of the defendant, the town of Hamden. On appeal, the plaintiff claims that the Appellate Court erred in determining that the word "submit" in § 12-63c (a) unambiguously requires that an assessor receive income and expense forms by June 1. We agree with the Appellate Court's construction of the relevant statutory text and, accordingly, affirm its judgment.

The record reveals the following undisputed facts and procedural history relevant to our resolution of this appeal. The plaintiff owns three rental properties located on Mix Avenue in Hamden. The plaintiff used these three properties for the primary purpose of producing rental income during the 2015 calendar year. On February 1, 2016, the assessor for the defendant assessed 520 Mix Avenue at $15,683,080, 609 Mix Avenue at $2,927,890, and 617 Mix Avenue at $10,521,560.

Seramonte Associates, LLC *v.* Hamden

On or before April 15, 2016, the assessor provided the plaintiff with separate forms on which to disclose the plaintiff's income and operating expenses for each of these three properties. Pursuant to § 12-63c (a), the plaintiff was required to complete and "submit" these forms by June 1, 2016. The assessor included a cover letter with each set of forms containing the following statement: "It should be clearly understood that if the attached report is not completed and submitted to the [a]ssessor's [o]ffice by June 1, 2016, it will result in a 10 [percent] penalty being applied to your assessment per [§ 12-63c (d)]." (Emphasis omitted.) The cover letter also stated that "[s]ubmission means this form is physically in the [a]ssessor's office by 4:30 on June 1, 2016, faxes, emails and postmarks WILL NOT BE ACCEPTED."[1] (Emphasis omitted.)

The plaintiff mailed the income and expense forms to the assessor via the United States Postal Service on May 31, 2016. The assessor received the forms on June 2, 2016, one day after the June 1 deadline set forth in § 12-63c (a). The assessor then imposed a 10 percent penalty on the plaintiff pursuant to § 12-63c (d), amounting to $132,145.16.[2]

The plaintiff subsequently commenced the present action pursuant to General Statutes § 12-119, alleging that the assessor's valuation of the three properties and the 10 percent penalty imposed under § 12-63c (d) were excessive. On February 27, 2017, the plaintiff withdrew its excessive valuation claim and, instead, continued to

---

[1] When the plaintiff did not request an extension by May 1, 2016, to submit the required information, as permitted under § 12-63c (a), the assessor informed the plaintiff in writing that it had not yet received the plaintiff's income and expense forms. In these letters to the plaintiff, dated May 24, 2016, the assessor reiterated that the forms must be physically in the assessor's office by June 1, 2016, and that postmarks would not be accepted.

[2] The new assessments for each of the plaintiff's properties were $17,251,388 for 520 Mix Avenue, $3,220,679 for 609 Mix Avenue, and $11,573,716 for 617 Mix Avenue.

Seramonte Associates, LLC *v.* Hamden

pursue only its claim that the 10 percent penalty was improper. The plaintiff simultaneously appealed from the assessment of the penalty to the defendant's board of assessment appeals (board), which conducted a hearing on March 2, 2017, and denied the plaintiff's appeal on March 21, 2017.

On May 1, 2017, the plaintiff filed an amended complaint to include a challenge to the board's decision.[3] The defendant filed a motion for summary judgment relating to the validity of the 10 percent penalty on December 21, 2017. In support of that motion, the defendant argued that the penalty was properly imposed on the plaintiff because the assessor did not receive the income and expense forms by June 1, 2016, as required under § 12-63c (a). The plaintiff, in its motion for summary judgment, argued that the penalty was improper because the statute only requires it to "submit" the materials, which, according to the plaintiff, means "to send" the materials. Thus, the plaintiff argued that its timely mailing was sufficient under the statute.

On February 5, 2019, the trial court granted the defendant's motion for summary judgment and denied the plaintiff's motion for summary judgment. In its memorandum of decision on those motions, the trial court determined that the word "submit," as it is utilized in

[3] The plaintiff's amended complaint also alleged that the 10 percent penalty violated the prohibitions on excessive fines set forth in the eighth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. The trial court subsequently granted the defendant's motion to strike those allegations from the complaint. The plaintiff appealed from the trial court's ruling on the motion to strike. *Seramonte Associates*, *LLC* v. *Hamden*, 202 Conn. App. 467, 480, 246 A.3d 513 (2021). The Appellate Court upheld the trial court's ruling, concluding that the eighth amendment to the United States constitution and article first, § 8, of the Connecticut constitution did not apply. Id., 483; see id., 486. The plaintiff sought, but was not granted, certification from this court to appeal from the judgment of the Appellate Court with respect to its claim that the 10 percent penalty imposed under § 12-63c (d) was excessive under the federal and state constitutions.

Seramonte Associates, LLC *v.* Hamden

§ 12-63c (a), "is susceptible to two reasonable interpretations." Looking to various dictionary definitions of that term, the trial court concluded that the word "submit" "could mean the [assessor] must receive the forms by June 1 or that the forms must be mailed to the [assessor] by June 1." The trial court then looked to extratextual evidence of the word's meaning and resolved the ambiguity in favor of the defendant. Specifically, the trial court noted that, although the legislative history does not make it clear what the word "submit" means, it was clear that the purpose of the penalty was to "ensure that municipal assessors could accurately and equitably assess the value of commercial properties . . . ." The trial court also looked to this court's decision in *PJM & Associates*, *LC* v. *Bridgeport*, 292 Conn. 125, 971 A.2d 24 (2009), a case in which this court held that the purpose of the 10 percent penalty under § 12-63c (d) "is to compel the submission of information to assist the assessor in performing his duties." Id., 145. The trial court further held that construing the word "submit" to require receipt would ensure uniformity in the tax process and consistency in enforcing the tax code, whereas the plaintiff's interpretation would frustrate the statute's fundamental purpose. The trial court also relied on a prior Superior Court decision that interpreted the language of § 12-63c to mean that an assessor must receive the tax forms by June 1. See *MSK Properties*, *LLC* v. *Hartford*, Superior Court, judicial district of New Britain, Docket No. CV-15-6029158-S (July 3, 2017) (64 Conn. L. Rptr. 747, 753). Ultimately, the trial court rendered judgment in the defendant's favor, concluding that the word "submit," as used in § 12-63c (a) "means that the [assessor] must receive the tax forms by June 1 of each year."

The plaintiff subsequently appealed from the trial court's judgment to the Appellate Court. *Seramonte Associates*, *LLC* v. *Hamden*, 202 Conn. App. 467, 468,

Seramonte Associates, LLC *v.* Hamden

246 A.3d 513 (2021). In that appeal, the plaintiff claimed that the trial court erred in its interpretation of § 12-63c by reading the word "submit" to require receipt of the income and expense forms by the assessor. Id., 469. The plaintiff renewed its assertion that the ordinary meaning of the word "submit" in § 12-63c means "to send . . . ." (Internal quotation marks omitted.) Id., 474–75.

The Appellate Court affirmed the trial court's judgment on a different basis. The Appellate Court noted that the trial court, in concluding that the word "submit" was ambiguous based on its dictionary definition alone, failed to consider, as required under General Statutes § 1-2z, both the text of the statute and its relationship to other statutes. Id., 477. On the basis of its own examination of tax statutes, the Appellate Court concluded that, when the legislature intends for the date of mailing or postmarking to be the date of submission, it includes the phrase "or postmarked . . . ." (Internal quotation marks omitted.) Id. The court held that, viewed in the context of other tax statutes, the word "submit," as used in § 12-63c (a), unambiguously requires delivery of the forms by June 1. (Internal quotation marks omitted.) Id., 479–80. Because there was no dispute that the plaintiff's forms were not delivered to the assessor by June 1, 2016, the court concluded that the trial court properly granted the defendant's motion for summary judgment. Id., 480. This court subsequently granted in part the plaintiff's petition for certification to appeal from the judgment of the Appellate Court, limited to the following issue: "Did the Appellate Court properly construe the phrase 'who fails to submit such information,' as it is used in . . . § 12-63c (d)?" *Seramonte Associates, LLC* v. *Hamden*, 336 Conn. 923, 246 A.3d 492 (2021).[4]

---

[4] The plaintiff argues that, notwithstanding this court's denial of certification on the issue, we must still consider its excessive fines claims under the doctrine of constitutional avoidance. We disagree. It is well settled in

Seramonte Associates, LLC *v.* Hamden

In the present appeal, the plaintiff claims that the Appellate Court erred in concluding that the phrase "submit . . . not later than the first day of June" in § 12-63c (a) requires the assessor's receipt of the income and expense forms by that date, and not simply mailing or postmarking. The plaintiff urges that the word "submit" means "to send" and requests that the Appellate Court's judgment be reversed. The defendant, in response, claims that the Appellate Court properly interpreted the word "submit" to require that the assessor receive the income and expense forms by June 1, and urges affirmance. For the reasons that follow, we agree with the Appellate Court that § 12-63c requires receipt of the income and expense information by June 1.

Because our review of the Appellate Court's legal determination turns on a question of statutory interpretation, we exercise plenary review. See, e.g., *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 416, 195 A.3d 664 (2018). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) Id. "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such rela-

_____

our case law that a party may present only those issues for which certification has been granted. See Practice Book § 84-9; see also, e.g., *State* v. *Turner*, 334 Conn. 660, 686 n.13, 224 A.3d 129 (2020). Construing the word "submit" to require sending would not prevent a future property owner from alleging, upon late postmarking, that the 10 percent penalty is excessive. The same would be true under any construction of the word "submit." Accordingly, the plaintiff's reliance on the doctrine of constitutional avoidance in this case is unavailing.

Seramonte Associates, LLC *v.* Hamden

tionship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.'' General Statutes § 1-2z.

We begin our analysis with the language of § 12-63c. Section 12-63c (d) provides in relevant part: ''Any owner of such real property required to submit information to the assessor in accordance with subsection (a) of this section for any assessment year, who *fails to submit such information as required under said subsection* (*a*) . . . shall be subject to a penalty equal to a ten per cent increase in the assessed value of such property for such assessment year. . . .'' (Emphasis added.) Section 12-63c (a), in turn, provides in relevant part: ''In determining the present true and actual value in any town of real property used primarily for purposes of producing rental income, the assessor . . . may require in the conduct of any appraisal of such property pursuant to the capitalization of net income method, as provided in section 12-63b, *that the owner of such property annually submit to the assessor not later than the first day of June*, on a form provided by the assessor not later than forty-five days before said first day of June, the best available information disclosing the actual rental and rental-related income and operating expenses applicable to such property. . . .'' (Emphasis added.)

Because the word ''submit'' is not defined in § 12-63c (a) or in the broader statutory scheme, we begin by looking to the dictionary definition of the word ''submit'' in order to understand its ordinary meaning. See, e.g., *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017); see also General Statutes § 1-1 (a) (''[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a

Seramonte Associates, LLC *v.* Hamden

peculiar and appropriate meaning in the law, shall be construed and understood accordingly''). Dictionary definitions contemporaneous with the statute's enactment in 1984 define the word ''submit'' as ''to commit to another'' and ''to make available . . . .'' Webster's New Collegiate Dictionary (1981) p. 1152. See generally *Maturo* v. *State Employees Retirement Commission*, supra, 176 (''[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning, as evidenced in dictionaries in print at the time the statute was enacted''). Although the concept of submission undoubtedly requires the holder of information to transmit it, by mail or some other means, the process of submission is not considered complete in many contexts until the information is delivered to the recipient.[5] Modern definitions are concordant and define the word ''submit'' as ''to *present* or *propose* to another for review, consideration, or decision . . . *to deliver formally* . . . .'' (Emphasis added.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1244. Presentation, proposal, or delivery for review, consideration, or decision, of course, necessitates receipt in addition to transmission.[6]

The plaintiff, however, also correctly notes that more recent dictionaries have defined the word ''submit'' as

[5] Although the plaintiff correctly notes that the word ''submit'' is derived in part from a Latin word, ''submittere,'' which means ''to send,'' it is the present meaning of that word that must govern. See General Statutes § 1-1 (a). Such a reading of the word ''submit'' is further supported by common parlance. Submitting a job application, for example, requires more than mere transmission. If an applicant's materials never reach the employer, and the employer is therefore unable to use or consider that information, one would not say that the materials had, in fact, been submitted.

[6] Dictionary definitions of ''present'' and ''propose,'' in turn, emphasize that the transmitted information must typically be delivered to the intended recipient. The definition of ''present'' is ''to bring or introduce *into the presence of someone* . . . .'' (Emphasis added.) Merriam-Webster's Collegiate Dictionary, supra, p. 982. ''Propose'' is defined as ''to *set before* the mind . . . .'' (Emphasis added.) Id., p. 997.

meaning "to send." Webster's Third New International Dictionary (1993) p. 2277 (defining "submit" as "to send or commit for consideration, study, or decision"). Although we acknowledge that the word "submit," based on such dictionary definitions alone, may well mean mere sending in other contexts, a reading of § 12-63c as a whole indicates that the legislature's use of that word in this specific context unambiguously requires receipt. See, e.g., *Planning & Zoning Commission* v. *Freedom of Information Commission*, 316 Conn. 1, 12–13, 110 A.3d 419 (2015) ("[i]t is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation" (internal quotation marks omitted)).

Section 12-63c (c) provides in relevant part: "If upon *receipt of information as required under subsection* (*a*) *of this section* the assessor finds that such information does not appear to reflect actual rental and rental-related income or operating expenses related to the current use of such property, additional verification concerning such information may be requested by the assessor. . . ." (Emphasis added.) The plaintiff relies on the use of different words in the same statute, "submit" in subsections (a) and (d) of § 12-63c, and "receipt" in § 12-63c (c), as proof that the legislature intended those two words to have different meanings. Although we agree with the general proposition that "[t]he use of . . . different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings"; (internal quotation marks omitted) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008); a closer reading of § 12-63c (c), in fact, supports the opposite conclusion. The phrase "receipt of information" in § 12-

Seramonte Associates, LLC *v.* Hamden

63c (c) is followed directly by the phrase "as required under subsection (a) . . . ." General Statutes § 12-63c (c). The verb "required" is tied clearly to the noun "receipt."[7] The introductory phrase in subsection (c), thus, was plainly intended to convey the message that subsection (a) requires receipt. As a result, § 12-63c (c) confirms, rather than undermines, a conclusion that the word "submit," as it was employed by our legislature in § 12-63c (a), was intended to require something more than transmission alone.

Further, we observe that construing the word "submit" in § 12-63c (a) to require receipt of the income and expense reports by the assessor on June 1 produces a more harmonious result with our existing case law. See *PJM & Associates*, *LC* v. *Bridgeport*, supra, 292 Conn. 142 ("[u]nder . . . [§ 12-63c (d)], a penalty may be imposed if the required information never reaches the assessor because the property owner does not provide the information"); see also, e.g., *State* v. *Jones*, 314 Conn. 410, 418–19, 102 A.3d 694 (2014) (holding that phrase "shall *submit* to the jury . . . [a]ll exhibits received in evidence" not only requires that trial court "send" exhibits to jury but also that jury has "a meaningful opportunity to study and consider an exhibit during its deliberations" (emphasis added; internal quotation marks omitted)).[8] Although *PJM & Associates*, *LC*, did

---

[7] The only other noun in the phrase "upon receipt of information as required" is, of course, "information." General Statutes § 12-63 (c). Had the legislature intended "information" to be the object of the verb "required," the introductory phrase in § 12-63c (c) would have read "upon receipt of *the* information required . . . ." The legislature's omission of the definite article "the" before the word "information" compels the grammatical conclusion that the noun "receipt" is the object of the verb "required."

[8] The plaintiff's reliance on *In re Lambirth*, 5 Cal. App. 5th 915, 211 Cal. Rptr. 3d 104 (2016), is likewise unavailing. In that case, the California Court of Appeal for the Sixth District held that the meaning of the word "submit" entailed "sending rather than receipt" because the prison delivery rule at issue provided that "an inmate's delivery of a document to prison authorities is deemed a constructive *filing* of the document." (Emphasis in original.) Id., 923. The court also noted that its construction of the word "submit"

Seramonte Associates, LLC *v.* Hamden

not specifically address the meaning of the word "submit" in § 12-63c (a), the underlying premise of that case is that it is the lack of receipt of the information that triggers the penalty. See *PJM & Associates, LC* v. *Bridgeport*, supra, 142–43. This case law constitutes persuasive authority that the common usage of the word "submit" contemplates not only transmission but also receipt. In the present case, the assessor is not in a position to study and consider income and expense information until it is received, not merely postmarked.

On the basis of our review of the text of § 12-63c, we conclude that the word "submit" unambiguously requires that the income and expense information be received by the assessor by June 1. The plaintiff's citations to various other statues are insufficient to alter our conclusion in this regard. The plaintiff argues that the legislature would have used the phrase "received by" or some other sufficiently clear language if it had intended for the word "submit" under § 12-63c (a) to require something more than mailing or postmarking. The plaintiff also argues that, as in § 12-63c (c), the legislature's use of "submit" and "received by" in other tax statutes indicates that submission and receipt have two inherently different meanings. The plaintiff is, of course, correct to note that certain statutes contain an express requirement that a form must be "received by" a certain date and that still other legislative enactments use both "submit" and "received by" within the same provision. See, e.g., General Statutes § 9-391 (a) ("[i]f such a certificate of a party's endorsement is not *received by* the clerk of the municipality by such time, such certificate shall be invalid" (emphasis added));

---

was "consistent with the directions on the [California Department of Corrections and Rehabilitation] form 602 (Inmate/Parolee Appeal), which tell the inmate, '[y]ou must *send* this appeal and any supporting documents to the [a]ppeals [c]oordinator . . . within [thirty] calendar days' . . . ." (Emphasis in original.) Id. As a result, *In re Lambirth* is not instructive.

Seramonte Associates, LLC *v.* Hamden

General Statutes § 12-129c (a) ("[s]uch taxpayer may *submit* such application to the assessor by mail, provided it is *received by* the assessor not later than April fifteenth in the assessment year with respect to which such tax relief is claimed" (emphasis added)); General Statutes § 12-170w (a) ("[s]uch taxpayer may *submit* such application to the assessor by mail, provided it is *received by* the assessor not later than April fifteenth in the assessment year with respect to which such tax relief is claimed" (emphasis added)). We are not persuaded.

The plaintiff's reliance on these statutes is undercut by the legislature's explicit use of the terms "postmark" and "postmarked" in other statutes. As the Appellate Court aptly noted, there are numerous statutes in which the legislature also expressly states that postmarking is sufficient to render a filing timely. See, e.g., General Statutes § 12-41 (e) (3) ("any declaration [of personal property] received by the municipality to which it is due that is in an envelope bearing a *postmark* . . . showing a date within the allowed filing period shall not be deemed to be delinquent" (emphasis added)); General Statutes § 12-129 ("Any person, firm or corporation who pays any property tax in excess of the principal of such tax . . . may make application in writing to the collector of taxes for the refund of such amount. Such application shall be delivered *or postmarked* by the later of [three events]." (Emphasis added.)); General Statutes § 12-146 ("[n]o tax or installment thereof shall be construed to be delinquent under the provisions of this section if . . . the envelope containing the amount due as such tax or installment, as received by the tax collector of the municipality to which such tax is payable, bears a *postmark* showing a date within the time allowed by statute for the payment of such tax or installment" (emphasis added)). Thus, the legislature's use of

Seramonte Associates, LLC *v.* Hamden

the phrase "received by" in the statutes cited by the plaintiff is not dispositive.

Indeed, there are also statutes that use both the word "submit" and the word "postmark" in the same statutory section. See, e.g., General Statutes § 22a-449n (e) (1) ("[o]n or after July 1, 2001, an owner shall *submit* to the commissioner an application that is *postmarked* no later than December 31, 2001" (emphasis added)). Accordingly, the plaintiff's reliance on statutes using the term "received by," alone or in conjunction with the word "submit," does not alter our conclusion that the word "submit," as it is used in the specific context of § 12-63c (a), unambiguously requires receipt of information on or before June 1.[9]

A conclusion that the term "submit" in § 12-63c (a) simply requires sending or postmarking has the potential to create unworkable results. See, e.g., *Wilkins* v. *Connecticut Childbirth & Women's Center*, 314 Conn.

---

[9] The plaintiff also argues that judgment in its favor is compelled as a matter of law because tax statutes must be strictly construed in favor of the taxpayer. Because we conclude that the statute's plain meaning is unambiguous, we do not address the plaintiff's assertion that this court must resolve ambiguities in tax statutes in favor of the taxpayer; nor do we conclude that § 12-63c is, in fact, a tax statute. See, e.g., *Key Air, Inc.* v. *Commissioner of Revenue Services*, 294 Conn. 225, 241, 983 A.2d 1 (2009) (presumption of strict construction in favor of taxpayer does not apply when statute is not ambiguous). Similarly, the plaintiff argues that the statute's penalty provision requires us to strictly construe the statute in its favor under the rule of lenity. Even if we were to assume that the rule of lenity applies to the imposition of the penalty authorized by § 12-63c (d), there would be no need to apply it to the present case because we conclude that the meaning of the word "submit" is unambiguous. *State* v. *Ledbetter*, 240 Conn. 317, 331 n.12, 692 A.2d 713 (1997) (rule of lenity "comes into play only if the statute remains ambiguous after all sources of legislative intent have been explored"); see also *Moskal* v. *United States*, 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990) (rule of lenity is reserved for those situations "in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute" (emphasis omitted; internal quotation marks omitted)).

Seramonte Associates, LLC *v.* Hamden

709, 723, 104 A.3d 671 (2014) ("[w]e must interpret the statute so that it does not lead to absurd or unworkable results" (internal quotation marks omitted)). Under the plaintiff's reading, the property owner's burden to provide income and expense information to the assessor under § 12-63c would end at the mailbox. Under this interpretation, if a property owner postmarks the required forms, and they are subsequently delayed or lost in the mail, the burden would be on *the assessor* to locate that data. If a postmark is all that is required, a property owner in such a case could claim that its burden under § 12-63c (a) had already been satisfied, even if the assessor never receives the forms. Such a construction would provide absolutely no incentive to a property owner either to ensure that the required information is, in fact, received by the assessor or to assist an assessor in locating or replacing the information that had been lost in transit.[10] Construing "submit" to require *receipt* of the income and expense forms no later than June 1 ensures that municipal assessors obtain necessary information in a timely fashion.[11]

On the basis of the foregoing, we conclude that the word "submit" in § 12-63c (a) unambiguously requires that the income and expense information be received by the assessor by June 1. See, e.g., *Connecticut Housing Finance Authority* v. *Alfaro*, 328 Conn. 134, 142, 176

[10] The fact that postmark deadlines may prove to be workable—or, indeed, even preferable—in various other contexts does not alter the fact that the adoption of such a rule in this specific setting could well leave municipal assessors without the information necessary to timely comply with the demanding statutory deadlines to which they are subject.

[11] We note that the question of whether the plaintiff's reading of the relevant statutory text "yield[s] absurd or unworkable results" is analytically distinct from the examination of extratextual sources, such as expressions of legislative intent and considerations of broader public policy, that typically follows a determination of textual ambiguity. General Statutes § 1-2z. Although the line between these separate realms may not always be perfectly clear, we believe that these pragmatic concerns properly inform our reading of § 12-63c (a) in the present appeal.

Seramonte Associates, LLC *v.* Hamden

A.3d 1146 (2018) ("[A]mbiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation. . . . In other words, statutory language does not become ambiguous merely because the parties contend for different meanings." (Internal quotation marks omitted.)). In the present case, therefore, the plaintiff did not "submit" its income and expense information when it placed that information in the hands of the United States Postal Service on May 31, 2016. The process of submission was not complete until the assessor received the forms on June 2, 2016, one day after the statutory deadline imposed by § 12-63c (a). Accordingly, the plaintiff failed to submit the required income and expense information under § 12-63c (d), and the 10 percent penalty imposed on the plaintiff pursuant to § 12-63c (d) was valid. The Appellate Court, therefore, properly affirmed the judgment of the trial court.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and D'AURIA, MULLINS and ALEXANDER, Js., concurred.


ECKER, J., with whom McDONALD, J., joins as to parts I and II only, concurring in the judgment. The verb "submit" has multiple meanings, including two very different ones: "to send" and "to present or deliver." The majority holds that, as used in General Statutes § 12-63c (a), the word "submit" *unambiguously* means to present or deliver rather than to send. I cannot agree. To the contrary, the word itself is ambiguous—indeed, archetypically so—and this intrinsic ambiguity is only heightened, not removed, by reference to other subsections of § 12-63c and other arguably related statutes. The real question in this case is not whether the statute is ambiguous but how that ambiguity should be resolved. That question is answered by

Seramonte Associates, LLC *v.* Hamden

resort to the usual tools of statutory construction, which, in this case, lead me to the same result reached by the majority. I write separately because methodology in statutory interpretation is important.

At the end of the day, I agree with the majority that § 12-63c should be construed to impose a delivery based deadline and, thus, required the plaintiff, Seramonte Associates, LLC, to deliver the relevant information to the defendant, the town of Hamden, on or before June 1, 2016. As I explain in greater detail in part I of this opinion, I do not reach this result because the statute contains clear and unambiguous language permitting no other conclusion. Indeed, I consider the statutory language in this regard to be opaque and unilluminating. Rather, as explained in part II of this opinion, I arrive at this result, not because the legislature has commanded it in unambiguous terms, but because it is the better, more reasonable construction of § 12-63c in light of that statute's manifest purpose, which, in my estimation as a judge, the legislature would have concluded is best achieved by construing the deadline in such a manner. My assessment in this regard is in harmony with the policy considerations expressed by the majority, with only one difference: I do not attribute the policy choice made interpretively by this court to emanate from an unambiguous legislative directive. Instead, it comes from my own assessment of what result best comports with the legislative objective underlying § 12-63c, as aided by the relevant legislative history. I make two concluding observations in part III of this opinion about statutory construction that can be learned from this case.

I

Section 12-63c employs the verb "submit" repeatedly to describe what is required of a taxpayer subject to the statute's terms. Subsection (a) requires the owner of

Seramonte Associates, LLC *v.* Hamden

real property used primarily for purposes of producing income to ''annually *submit* to the assessor not later than the first day of June, on a form provided by the assessor not later than forty-five days before said first day of June, the best available information disclosing the actual rental and rental-related income and operating expenses applicable to such property. . . .'' (Emphasis added.) General Statutes § 12-63c (a). Subsection (d) imposes a penalty on any owner who fails to comply with the statutory requirement: ''Any owner of such real property *required to submit* information to the assessor in accordance with subsection (a) of this section for any assessment year, who *fails to submit* such information as required under said subsection (a) . . . shall be subject to a penalty equal to a ten per cent increase in the assessed value of such property for such assessment year. . . .'' (Emphasis added.) General Statutes § 12-63c (d).

The search for statutory ambiguity—the threshold inquiry that has become the predominant focus of statutory construction since the enactment of General Statutes § 1-2z—must begin with a definition of what ambiguity means in this context. Emphatically, the search for ambiguity is *not* a merits inquiry, and a court must not jump the gun to assess, at this threshold stage, which is the better or stronger interpretation of an ambiguous term. The only question is whether there is more than one *plausible* interpretation of the statute. As we recently explained, ''although there must be more than one reasonable interpretation of a statute in order for it to be considered ambiguous, those interpretations need not be necessarily strong or have a high probability of success. Put differently, a statute is plain and unambiguous when the meaning . . . is so strongly indicated or suggested by the [statutory] language . . . that . . . it appears to be *the* meaning and appears to preclude any other likely meaning. . . . [I]f the text of

Seramonte Associates, LLC *v.* Hamden

the statute at issue . . . would permit more than one likely or plausible meaning, its meaning cannot be said to be plain and unambiguous.'' (Emphasis in original; internal quotation marks omitted.) *Ledyard* v. *WMS Gaming, Inc.*, 338 Conn. 687, 698 n.6, 258 A.3d 1268 (2021); see *State* v. *Felix R.*, 319 Conn. 1, 24–25, 124 A.3d 871 (2015) (*McDonald, J.*, concurring) (''Under our rules of statutory construction, an ambiguity arises whenever statutory language is subject to more than one plausible interpretation. . . . Ambiguity, as a matter of statutory construction, does not require two or more *equally* reasonable interpretations.'' (Citations omitted; emphasis in original.)).

It is impossible not to find ambiguity in the use of the word ''submit,'' as it appears in § 12-63c. Indeed, the ambiguity exists at three levels. First, the word ''submit'' itself conveys multiple different meanings. Second, the word ''submit,'' as used in § 12-63c, retains that ambiguity; the statute does not provide contextual aid that serves to eliminate either of the textually plausible interpretations. Third, reference to other statutes using the same, similar, or alternative language also fails to resolve the ambiguity.

Section 12-63c, which requires a taxpayer annually to ''submit'' certain information to the assessor and penalizes the taxpayer for noncompliance, is pregnant with ambiguity for the simple reason that the word ''submit'' can mean either to *send* or to *deliver*. The dictionary definition of the word gives both meanings in a single entry: ''to send or commit for consideration, study, or decision . . . .'' Webster's Third New International Dictionary (2002) p. 2277. Indeed, some courts have found that the word ''submit'' means precisely what the majority says is not a plausible meaning, i.e., ''to send.'' In *In re Youhoing*, 843 Fed. Appx. 248 (11th Cir. 2021), the Eleventh Circuit Court of Appeals concluded that a court order requiring the petitioner to

Seramonte Associates, LLC *v.* Hamden

"submit" an application by a specified date was met when the application was sent prior to that date, even though it was received by the court after that date: "Under the terms of the [D]istrict [C]ourt's order, [the debtor] had to submit her [in forma pauperis] application by June 16, 2020. Submit means to send or commit for consideration, study, or decision. Webster's Third New International Dictionary [(1986) p. 2277]. [The debtor] sent her [in forma pauperis] application for the [D]istrict [C]ourt's consideration by June 16, 2020. Her [first class, United States] [m]ail package was marked with a June 15, 2020 postage date," although it was received on June 18, 2020. (Internal quotation marks omitted.) *In re Youhoing*, supra, 250.

The same conclusion was reached by a California Court of Appeal construing a prison regulation that required an inmate to "submit" an appeal from a classification decision within thirty days of the decision at issue. See *In re Lambirth*, 5 Cal. App. 5th 915, 923, 211 Cal. Rptr. 3d 104 (2016) (" 'Submit' is not defined in the regulations. Merriam-Webster's Collegiate Dictionary defines the verb 'submit' as 'to present or propose to another for review, consideration, or decision.' [Merriam-Webster's Collegiate Dictionary (11th Ed. 2009) p. 1244.] Webster's Third New International Dictionary similarly defines 'submit' as 'to send or commit for consideration, study, or decision.' [Webster's Third New International Dictionary (1993) p. 2277.] We conclude from these definitions that the plain, commonsense meaning of 'submit' entails sending rather than receipt."). One federal court, construing a statute requiring that a beneficiary designation form be received prior to the insured's death to be effective, concluded that the words "submitted" and "received" have *opposite* meanings. See *Metropolitan Life Ins. Co.* v. *Bradshaw*, 450 F. Supp. 3d 1258, 1264 n.38 (W.D. Okla. 2020) ("[The] terms [submitted and received] are not interchangeable.

Seramonte Associates, LLC *v.* Hamden

To submit something means '*to send* or commit for consideration' . . . or '[t]o bring up or *present* for criticism, consideration, or approval' . . . . That is quite the opposite of receiving." (Citations omitted; emphasis in original.)) We need not go nearly so far to acknowledge that the word "submit" is at least ambiguous.[1]

I also consider it significant that the word "submit" comes from the Latin term, "mittere," to send. See Webster's Third New International Dictionary (2002) p. 2277 ("submit" derives from "[Middle English] submitten, [from Latin] submittere to let down, lower, set under, [from] sub- + mittere to send, throw"). The meaning of words can evolve over time, and there is no rule of construction requiring that the contemporary meaning of a word must remain true to its etymological origin. But it seems particularly compelling in our search for ambiguity that the precise meaning of the word advanced by the plaintiff is not only used to define that word in a modern dictionary, but also is the literal meaning of the word's original Latin root. Reference to the original Latin, Greek, or other root of a word can be a helpful clue to its meaning in the law. See, e.g., *Chamberlain* v. *Hemingway*, 63 Conn. 1, 5–6, 27 A. 239 (1893) (considering Latin root of word "river" to help determine meaning of term "watercourse").

The second level of ambiguity in the present case exists at the statutory level, within the context of § 12-63c and its various provisions. Often, the meaning of

---

[1] One way to harmonize the opposing meanings highlighted by these cases is to recognize that the proper construction of the word "submit" may depend on whether the action is seen from the perspective of the sender or the recipient of the submission, at least when there is a time interval between the acts of sending and receiving. To the taxpayer, in other words, the materials are submitted when they are sent; to the assessor, they are submitted when they are received. This understanding resolves the opposition while simultaneously illustrating the ambiguity inherent in the word.

Seramonte Associates, LLC *v.* Hamden

an ambiguous word will be clarified by other provisions in the same statute. See, e.g., *In re Elianah T.-T.*, 326 Conn. 614, 623, 165 A.3d 1236 (2017) ("[i]n resolving [statutory] ambiguity, we first look to other portions of the language in [the same statute]"); *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 723, 6 A.3d 763 (2010) (when statutory term is ambiguous, court may "turn for guidance to other provisions in the statutory scheme" governing same subject matter). Not so here.

In particular, I disagree with the majority's view that the language used in § 12-63c (c) removes the ambiguity. That subsection provides in relevant part: "If upon receipt of information as required under subsection (a) of this section the assessor finds that such information does not appear to reflect actual rental and rental-related income or operating expenses related to the current use of such property, additional verification concerning such information may be requested by the assessor. . . ." General Statutes § 12-63c (c). The majority believes that this provision reinforces its conclusion that the word "submit" unambiguously means receive, not send, because it clarifies "that the word 'submit,' as it was employed by our legislature in § 12-63c (a), was intended to require something more than transmission alone."

I read subsection (c) of § 12-63c differently and understand its language to heighten (or at least replicate) the ambiguity contained in subsection (a), rather than to confirm the absence of any ambiguity. I might see the majority's point if subsection (c) authorized the assessor to request additional verification concerning such information if, "upon [*submission*] of information as required under subsection (a) . . . the assessor finds such information does not appear to reflect actual rental and rental-related income or operating expenses . . . ." (Emphasis added.) General Statutes § 12-63c (c).

Seramonte Associates, LLC *v.* Hamden

That language would tend to demonstrate that "submit" must mean deliver to the assessor rather than send to the assessor because the assessor plainly could not find the information lacking unless and until the assessor actually received and reviewed that information. But, because subsection (c) uses the phrase "upon *receipt* of information" rather than "upon *submission* of information," the language suggests that receipt and submission should be understood to mean *different* things, not the same thing. See, e.g., *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008) ("[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" (internal quotation marks omitted)); see also *Stone* v. *East Coast Swappers, LLC*, 337 Conn. 589, 602, 255 A.3d 851 (2020) (concluding that statute is ambiguous based in part on use of slightly different language in two different subsections of same statute).

The majority candidly acknowledges this problem and seeks to avoid its implications by pointing to the language in § 12-63c (c) providing that the assessor may act "upon receipt of information *as required under subsection (a) of this section,*" and by arguing that the emphasized language modifies or informs what is meant by the word receipt. (Emphasis added.) In my view, this observation merely begs the question. Again, I may agree with the majority's claim if the statute said "upon submission of information as required . . . ." But— particularly in light of the oft cited rule of construction that a legislature will not use different words to mean the same thing in the same statute—I cannot agree that "submit" and "receipt" are rendered synonymous, and that the meaning of "submit" is thereby rendered unambiguous, by the legislature's clarifying reference back

Seramonte Associates, LLC *v.* Hamden

to subsection (a). The ambiguity we face in the present case is not about what information is required by subsection (a). Nor is it about whether the information, as required by subsection (a), must be actually received by the assessor—of course it must. The question, for purposes of § 12-63c (a), is *when* the taxpayer will be deemed to have submitted the information for purposes of meeting the time deadline set forth in § 12-63c (a)— when the information is sent by the taxpayer or when it is received by the assessor? That question is not answered in subsection (c) of the statute, and it certainly is not answered in dispositive fashion.

I readily acknowledge that the legislature, in drafting § 12-63c, may have considered the two events, submission and receipt, to occur simultaneously; the taxpayer submits the information when the assessor receives it. Perhaps that is even the better reading of the statute. But "perhaps" is not enough to make a plausible reading implausible. In sum, I cannot say that the plaintiff's reading of the statute is unreasonable or implausible because it is sensible to posit that there can be a gap in time between when a document is submitted (sent) and when it is delivered (received), and there is nothing in § 12-63c that eliminates such an interpretation from the realm of plausibility.

The third level of ambiguity relevant to our analysis exists at a broader level, upon turning to other statutes imposing deadlines for filing tax related forms of one kind or another. I do not purport to offer a comprehensive treatment of all such laws, and, as should become clear, the validity of my point does not require such an encyclopedic survey. My purpose is simply to show that the legislature is fully capable of drafting statutes that do not contain the uncertain meaning that we confront in § 12-63c. For whatever reason, it did not employ unambiguous language in this particular statute. This

Seramonte Associates, LLC *v.* Hamden

observation further explains why I feel justified, and even compelled, to find the language ambiguous.

There are numerous statutes that make it very clear, in one way or another, that a taxpayer will not be in compliance with a statutory filing deadline unless the required materials are *received* by the relevant authority on or before that deadline. See, e.g., General Statutes (Supp. 2022) § 12-129c (a) ("[s]uch taxpayer may submit such application to the assessor by mail, provided it is *received by* the assessor not later than April fifteenth in the assessment year" (emphasis added)); General Statutes § 12-146 ("[i]f any tax, at the time of assessment or because of a subsequent division, represents two or more items of property, the collector may *receive* payment in full of such part of the principal and interest of such tax as represents one or more of such items, even though interest in full on the entire amount of the principal of such tax has not been received up to the date of such payment" (emphasis added)); General Statutes (Supp. 2022) § 12-170w (a) ("[s]uch taxpayer may submit such application to the assessor, provided it is *received by* the assessor not later than April fifteenth in the assessment year with respect to which such tax relief is claimed" (emphasis added)); General Statutes § 12-233 (a) (1) (B) ("[w]here, within the sixty-day period ending on the day on which the time prescribed in this section for mailing a notice of deficiency assessment for any income year would otherwise expire, the commissioner *receives* a written document signed by such taxpayer showing that such taxpayer owes an additional amount of tax for such income year, the commissioner then shall have up to sixty days after the day such written document is received in which to mail a notice of deficiency assessment" (emphasis added)).[2]

---

[2] Other such statutes exist outside of the tax context. See, e.g, General Statutes (Supp. 2022) § 9-140 (a) (2) ("If a municipal clerk has a facsimile machine or other electronic means, an applicant may return a completed application to the clerk by such a machine or device, provided the applicant shall also mail the original of the completed application to the clerk, either

Seramonte Associates, LLC *v.* Hamden

Likewise, numerous other statutes are drafted to clearly indicate that a taxpayer will comply with a statutory filing deadline if the required materials are mailed on or before that deadline. See, e.g., General Statutes § 12-41 (e) (3) ("any declaration [of personal property] received by the municipality to which it is due that is in an envelope bearing a *postmark* . . . showing a date within the allowed filing period shall not be deemed to be delinquent" (emphasis added)); General Statutes § 12-129 ("Any person, firm or corporation who pays any property tax in excess of the principal of such tax . . . may make application in writing to the collector of taxes for the refund of such amount. Such application shall be delivered *or postmarked* by the later of [three events]." (Emphasis added.)); General Statutes § 12-146 ("[n]o tax or installment thereof shall be construed to be delinquent under the provisions of this section if . . . the envelope containing the amount due as such tax or installment, as received by the tax collector of the municipality to which such tax is payable, bears a *postmark* showing a date within the time allowed by statute for the payment of such tax or installment" (emphasis added)).

For whatever reason, the legislature did not use either one of these more standard formulations when it

separately or with the absentee ballot that is issued to the applicant. If the clerk does not *receive* such original application by the close of the polls on the day of the election, primary or referendum, the absentee ballot shall not be counted." (Emphasis added.)); cf. Practice Book § 2-79 (a) ("The client security fund committee shall send a notice to each attorney who has not paid the client security fund fee pursuant to Section 2-70 of these rules that the attorney's license to practice law in this state may be administratively suspended unless within sixty days from the date of such notice the client security fund committee *receives* from such attorney proof that he or she has either paid the fee or is exempt from such payment. If the client security fund committee does not *receive* such proof within the time required, it shall cause a second notice to be sent to the attorney advising the attorney that he or she will be referred to the Superior Court for an administrative suspension of the attorney's license to practice law in this state unless within thirty days from the date of the notice proof of the payment of the fee or exemption is *received*." (Emphasis added.)).

Seramonte Associates, LLC *v.* Hamden

drafted § 12-63c, and we are left uncertain what to make of the variation. The majority acknowledges that many statutes imposing filing deadlines employ language that unambiguously requires that the materials must either be mailed or received, as the case may be, on or before the designated deadline. The majority emphasizes the fact that those statutes contain language that is different in some way from the language used in § 12-63c. And that is exactly the point—the legislature clearly knows how to draft statutes that are unambiguous in this particular regard so that the person subject to the filing deadline knows with certainty whether the materials must be mailed by the deadline or received by the deadline. Section 12-63c is ambiguous precisely because it does *not* contain the language that would make the requirement clear but, instead, uses language that could convey either meaning. It could be said that, by using the word "submit," § 12-63c requires that the information must be received by the June 1 deadline because the statute does not contain the postmarked language contained in other statutes. But it just as easily could be said that, by using the word "submit," § 12-63c permits the information to be sent (but not received) by June 1, because the statute uses the same "submit" language used to mean "sent" in § 12-129c and General Statutes (Supp. 2022) § 12-170w, but does not include the qualifying language in those statutes requiring receipt by the deadline.

The ambiguity contained in § 12-63c regarding the meaning of the word "submit," in summary, is heightened due to the existence of the many other statutes in Connecticut that impose filing deadlines using far more definitive language. Those statutes leave me still more unsure about what to make of the legislature's use of different, less definitive language in §12-63c. The only thing certain, in my view, is that "it is quite impossible to tell" exactly what the statute means, "and the

Seramonte Associates, LLC *v.* Hamden

magic wand of ipse dixit does nothing to resolve that ambiguity.'' *United States* v. *Yermian*, 468 U.S. 63, 77– 78, 104 S. Ct. 2936, 82 L. Ed. 2d 53 (1984) (Rehnquist, J., dissenting).

II

The question remains how to resolve the ambiguity that has been identified. There are only two alternatives: either the statute required the taxpayer's information to be delivered to the assessor by June 1, 2016, in which case the penalty properly was imposed on the plaintiff, or the information was submitted in compliance with the statute when it was sent to the assessor prior to June 1, 2016, in which case the penalty must be vacated. I have no easy answer, but I believe that the assistance provided by the canons of construction allows us to arrive at a wholly credible resolution of the question presented without the need to declare the statutory language unambiguous.[3] This is not to say that all of the interpretive clues point in the same direction. In

---

[3] There are different ways to categorize the manifold canons of construction, but most scholars identify three distinct categories: textual (or intrinsic aid) canons, reference (or extrinsic aid) canons, and substantive canons. One commentator has provided this helpful summary: ''Textual canons are those canons whereby the interpreter, looking solely at the text of the statute, can apply a canon to resolve an ambiguity in the text.'' A. Kiracofe, Note, ''The Codified Canons of Statutory Construction: A Response and Proposal to Nicholas Rosenkranz's *Federal Rules of Statutory Interpretation*,'' 84 B.U. L. Rev. 571, 574 n.15 (2004). ''Reference canons refer the interpreter to interpretive guides that can be found outside of the text of the statute, 'extrinsic aids' such as the previous [common-law] solution to the problem the statute addresses, the legislative history of the statute, or agency interpretations of the statute.'' Id., 575 n.15. ''Substantive canons are canons that provide interpretive guidance by taking into account the substance or subject area of the statute being interpreted. Under these doctrines, some statutes are construed strictly (i.e., criminal statutes, statutes in derogation of the common law, and statutes that infringe on a domestic or foreign state's sovereign immunity) . . . while others are construed liberally (i.e., civil rights statutes, securities statutes, and antitrust statutes).'' (Citation omitted.) Id., 574–75 n.15.

345 Conn. 76 OCTOBER, 2022 105

Seramonte Associates, LLC *v.* Hamden

fact, a reasonable argument can be made in favor of either side.

On the one hand, there is the familiar and oft applied canon of construction directing that "[a] statute imposing a penalty should receive a strict construction in favor of those who might be subject to its provisions." *Hartford-Connecticut Trust Co.* v. *O'Connor*, 137 Conn. 267, 274, 76 A.2d 9 (1950). This rule is not limited to criminal penalties but includes statutory civil penalties, as well,[4] and has been applied specifically to tax statutes imposing civil penalties. See, e.g., *Commissioner of Internal Revenue* v. *Acker*, 361 U.S. 87, 91, 80 S. Ct. 144, 4 L. Ed. 2d 127 (1959) ("We are here concerned with a taxing [a]ct [that] imposes a penalty. The law is settled that penal statutes are to be construed strictly

---

[4] See, e.g., *Caldor's, Inc.* v. *Bedding Barn, Inc.*, 177 Conn. 304, 317, 417 A.2d 343 (1979) ("the fact that the alternate remedy is nominally civil in form does not make an essentially penal statute primarily remedial"); *Mott's Super Markets, Inc.* v. *Frassinelli*, 148 Conn. 481, 488, 172 A.2d 381 (1961) (When it "provided for a penalty [for the violation of a civil statute], the legislature changed the fundamental nature of the act. It made a violation a public, as distinguished from a private, wrong. The statute became penal. . . . As a penal statute, it must be strictly construed." (Citations omitted.)); *Dennis* v. *Shaw*, 137 Conn. 450, 453, 78 A.2d 691 (1951) ("to construe [the statute] as creating by implication a civil liability . . . would violate the [long recognized] principle of statutory construction that penal statutes are to be construed strictly and not extended by implication"); *Bankers Trust Co.* v. *Blodgett*, 96 Conn. 361, 366, 114 A. 104 (1921) ("[t]he test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual" (internal quotation marks omitted)), aff'd, 260 U.S. 647, 43 S. Ct. 233, 67 L. Ed. 439 (1923); see also *Bergamatto* v. *Board of Trustees of NYSA-ILA Pension Fund*, 933 F.3d 257, 268 (3d Cir. 2019) (citing cases from various federal courts applying canon to hold that statutory penalty provision in Employee Retirement Income Security Act must be strictly construed); 3 S. Singer, Sutherland Statutes and Statutory Construction (8th Ed. 2020) § 59.1, pp. 167–68 ("[c]ourts usually construe a statute as penal [when] its primary purpose is expressly enforceable by fine, imprisonment, forfeiture, certain types of civil recoveries, or similar punishment"); 3 S. Singer, supra, § 59.1, p. 172 ("[a] statute usually is penal if it contains some sanction to compel obedience beyond mere redress to an individual for injuries received").

Seramonte Associates, LLC *v.* Hamden

. . . and that one is not to be subjected to a penalty unless the words of the statute plainly impose it . . . .'' (Citations omitted; footnote omitted; internal quotation marks omitted.)); *Bassett* v. *Commissioner of Internal Revenue*, 67 F.3d 29, 34 (2d Cir. 1995) (Leval, J., dissenting) (''[t]he [United States] Supreme Court has repeatedly stated that ambiguities in the penalty provisions of tax statutes are to be strictly construed against the government''); *United States* v. *Hill*, 368 F.2d 617, 621 (5th Cir. 1966) (statute imposing penalty for failure to collect and pay taxes must be strictly construed); *Estate of Skeba* v. *United States*, 432 F. Supp. 3d 461, 467 (D.N.J. 2020) (noting long established rule of strict construction in such cases), appeal dismissed, Docket No. 20-1464, 2020 WL 5200912 (3d Cir. April 15, 2020); Internal Revenue Service, Technical Advice Memorandum No. 9627004, 1996 WL 374422 (July 5, 1996) (''It is a settled rule that statutes imposing penalties should be strictly construed. All questions in doubt must be resolved in favor of those from whom the penalties are sought.''). See generally S. Johnson, ''The Canon That Tax Penalties Should Be Strictly Construed,'' 3 Nev. L.J. 495, 498 (2003) (noting that, ''[a]lthough the [canon] is irregular in its application, it is of long familiarity'').[5]

The fundamental principle animating the rule of strict construction as applied to penal statutes has been summarized as follows: ''Strict construction is a means of [en]suring fairness to persons subject to the law by requiring penal statutes to give clear and unequivocal warning in language that people generally would understand, concerning actions that would expose them to liability for penalties and what the penalties would be. . . . Another reason for strict construction is to protect the individual against arbitrary discretion by officials and judges. . . . A related argument is to the effect

---

[5] The canon is not without its critics. See, e.g., S. Johnson, supra, 3 Nev. L.J. 504–25 (arguing that canon is unnecessary and unwise for various reasons).

Seramonte Associates, LLC *v.* Hamden

that [because] the power to declare what conduct is subject to penal sanctions is legislative rather than judicial, it would risk judicial usurpation of the legislative function for a court to enforce a penalty whe[n] the legislature had not clearly and unequivocally prescribed it.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Cote*, 286 Conn. 603, 615–16, 945 A.2d 412 (2008); see 3 S. Singer, Sutherland Statutes and Statutory Construction (8th Ed. 2020) § 59.3, pp. 188–94 (''[T]he [strict construction] premise has always been grounded in the separation of powers principle and classical liberal ideas about individual rights and freedoms. The usual rationales for the rule include: [t]he power to punish is vested in the legislative and not the judicial department; [because] the state makes the laws, they should be construed most strongly against it; to avoid arbitrary judicial discretion; legislatures should be required to provide fair warning in common language of what a law intends; to temper harshness [when] a punishment is disproportionate; [and] the law's 'tenderness' for individual rights. Courts most commonly invoke the justifications relating to fair notice and legislative supremacy.'' (Footnotes omitted.)).

The applicability of this important principle is not avoided in the present case by the observation that the plaintiff taxpayer was, in fact, notified by the defendant town of its view that the statute required delivery of the designated information by the June 1 deadline. That fact is irrelevant because the issue before us is one of statutory construction, not the fairness of the statute's application to any specific taxpayer based on extraneous circumstances. The inquiry is what the legislature intended and whether the enactment of that intention in § 12-63c provides fair notice of the conduct that will trigger the statute's penalty provision. The proper construction of the statute does not turn on the municipal assessor's interpretation. Nor does it ask whether the

Seramonte Associates, LLC *v.* Hamden

taxpayer received notice of the municipal assessor's interpretation.

There is another hand, however, as so often is the case, and it offers competing considerations that recommend a contrary result. There are some rather obvious and compelling policy considerations that favor a construction of the statute to require *delivery* of the information to the office of the assessor on or before the statutory deadline. A delivery deadline establishes a bright-line, uniform rule that is not subject to the vagaries of the many different delivery methods (regular mail, express mail, electronic transmission, etc.). As the majority points out, a delivery based deadline eliminates the problems of proof that would otherwise arise using a deadline based on when the required information is sent by the taxpayer. Perhaps most important, in the words of the majority opinion, a delivery deadline most effectively "ensures that municipal assessors obtain necessary information in a timely fashion." Text accompanying footnote 11 of the majority opinion. I agree entirely with the majority's observations in this regard. What separates us is not the substance of these policy considerations or the conclusion reached upon consideration of them, but a methodological difference; I do not believe that these policy considerations properly are included as part of the ambiguity analysis under § 1-2z.[6] See part III of this opinion.

Indeed, my conclusion that § 12-63c is ambiguous allows me to consult the legislative history of the stat-

_____

[6] I do not agree with the majority that we must construe the statute to impose a delivery based deadline because the alternative would be "unworkable . . . ." Construing the statute to impose a "when sent" deadline would very likely not work *as well* as a delivery based deadline in terms of ease of administration, but it clearly would not be *unworkable*; many deadlines are satisfied by mailing rather than delivery, with the burden on the sender to prove timely mailing when a dispute arises. See, e.g., *Rivers* v. *New Britain*, 288 Conn. 1, 17, 950 A.2d 1247 (2008) (for purposes of § 1-2z, "unworkable" means "not capable of being put into practice successfully" (internal quotation marks omitted)).

Seramonte Associates, LLC *v.* Hamden

ute, and there to find objective support for the majority's supposition that a delivery deadline best serves the legislature's intention to provide tax assessors with enough time to perform their work. The support is indirect and perhaps only of moderate assistance in construing the precise nature of the submission deadline in § 12-63c, but it demonstrates that the legislature did, in fact, intend to impose a deadline that would make it easier for assessors to complete their work on a timely basis. For that very reason, § 12-63c (a) was amended in 1987 to move the submission date up from November 1, to June 1, of the relevant assessment year. See Public Acts 1987, No. 87-94, § 1. During the Joint Standing Committee Hearings, Charles Agli, the assistant tax assessor of the city of New Britain, stated that the change of date was required because municipalities complete their appraisals from July through September, "and to receive the information in November is too late to be of any use." Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 2, 1987 Sess., p. 595; see 30 H.R. Proc., Pt. 8, 1987 Sess., p. 2748, remarks of Representative Ronald L. Smoko ("This bill will allow our assessors a bit more information in order to determine fair market value on income property by requiring that information on income and expenses be provided to the assessor in June of an assessment year rather than November. They only have until January [31] to file the final grand list . . . . This bill will allow them to handle their valuations in a more deliberative fashion, [and] provide them with the time needed."). These remarks indicate that the legislature was aware of the time sensitive nature of the information to be submitted and support the view that it did not intend that the taxpayer could comply with the statute by mailing a form that might be delayed or lost in the mail.

Seen from this perspective, construing § 12-63c to establish a delivery based filing deadline is consistent

Seramonte Associates, LLC *v.* Hamden

with the most fundamental and time-honored rule of statutory construction dating back to the earliest days of our scheme of government: "A statute ought to be construed [by the judicial authority] according to the true intention of the makers." *State* v. *Brooks*, 4 Conn. 446, 447 (1823); see *Knox* v. *Protection Ins. Co.*, 9 Conn. 430, 434–35 (1833) ("such construction ought to be given, as will effectuate the intentions of the legislature . . . such as will promote the object, and prevent the evil [as intended]"). Although there is a divergence of opinion about the *means* by which judges can or should ascertain the legislature's intentions when engaging in the task of statutory construction, few would dispute that the ultimate objective remains unchanged. See, e.g., *State* v. *Banks*, 321 Conn. 821, 842, 146 A.3d 1 (2016) ("reviewing courts should not construe statutes in disregard of their context and in frustration of the obvious legislative intent or in a manner that is hostile to an evident legislative purpose . . . or in a way that is contrary to common sense" (internal quotation marks omitted)); *State* v. *DeCiccio*, 315 Conn. 79, 98, 105 A.3d 165 (2014) ("[s]tatutes should be construed . . . to effectuate the legislature's intent, consistent with the ordinary meaning of the words used"); *State* v. *George A.*, 308 Conn. 274, 283 n.11, 63 A.3d 918 (2013) ("[t]his commonsense interpretation of the statute [prohibiting the possession of child pornography] advances the legislative purpose of protecting children by targeting the market for child pornography" (internal quotation marks omitted)); *Turner* v. *Turner*, 219 Conn. 703, 712, 595 A.2d 297 (1991) ("compelling principles of statutory construction . . . require us to construe [an ambiguous] statute in a manner that will not thwart its intended purpose"); see also *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 140, 202 A.3d 262 ("canons of [statutory] construction . . . [are] merely [tools] to assist us in gleaning [legislative intent]; [they] should

Seramonte Associates, LLC *v.* Hamden

not be applied in the face of a contrary manifestation of legislative intent''), cert. denied sub nom. *Remington Arms Co.*, *LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019); 2A N. Singer & S. Singer, Statutes and Statutory Construction (7th Ed. 2014) § 47-22, p. 402 (''canons of statutory construction . . . [are] only an aid to the ascertainment of the true meaning of the statute'' and must be given effect to ensure ''that the will of the [l]egislature shall not fail'' (internal quotation marks omitted)).

Having considered the arguments on both sides of the dispute, an umpire could declare either side a winner in the tug-of-war between competing considerations. One might reasonably conclude that it is both sensible and important to require the government to speak in clear and unequivocal terms before it will be allowed to impose a substantial penalty on a taxpayer who delivers tax forms one day late, and § 12-63c, unlike other statutes, fails to provide such unequivocal notice. Alternatively, it is entirely reasonable to hold that it does no violence to the ambiguous but clear enough meaning of the word ''submit'' to construe § 12-63c to create a simple, bright-line rule requiring all taxpayers to deliver the tax information on or before June 1, especially when such a rule best facilitates the fair and efficient administration of the underlying legislative objective.

I am persuaded that the latter reasoning should prevail in the present case because, for the reasons discussed, a delivery rule is consistent with the statutory text and, in my view, best serves the legislative purpose and intention. The statutory text unquestionably permits such a reading—''submit'' can mean to deliver or to present—and a delivery based deadline avoids the numerous practical difficulties that would be caused by a ''when sent'' rule. Accordingly, I concur in the result that the majority reaches and would affirm the judgment of the trial court.

Seramonte Associates, LLC *v.* Hamden

### III

Why spill so much ink to arrive at the same ultimate conclusion as the majority? Perhaps it is enough to say that the analytical path taken by a court in any judicial decision matters as much as the outcome because it is the reasoning of the court that must be examined and apprehended by anyone wishing to understand the precedential meaning of the decision. The difference in approach in this case, in my view, was significant enough to justify writing separately. It also provides an opportunity to identify two points of concern emerging from this analysis that I consider worthy of consideration.

First, this case illustrates quite starkly that the rules of statutory construction work best when they are heeded not only by the judges who read the statutes but by the legislators who write them. This is true because most rules of construction operate as presumptions that judges employ to understand how the legislature communicates its intended meaning.[7] These presumptions work—that is, the judicial construction of a statute will accurately apprehend the legislative intention—only if the legislature in fact operates in accordance with the same rules. In this sense, the activ-

---

[7] These presumptions are too numerous to catalog. By way of example only, they include the presumption that the legislature chooses its words with the utmost care to express its intention; no word or phrase is superfluous; different but similar words used in the same statutory scheme are intended to have different meanings; the legislature is aware of related statutory and common-law doctrine; particular statutory enumerations will be understood to limit the scope of an associated general term; the inclusion of one thing will imply the exclusion of others; a limiting clause or phrase is read as modifying only the noun or phrase that immediately precedes it unless the limiting language is separated from the preceding noun or phrase by a comma, in which case one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it; criminal statutes, as a general rule, apply prospectively only, in the absence of a clear and unequivocal expression of a contrary legislative intent; and civil statutes that affect substantive rights usually will apply prospectively only, whereas procedural statutes usually will be applied retroactively.

Seramonte Associates, LLC *v.* Hamden

ity of statutory construction is dialogic; it functions as a cooperative interbranch venture that will succeed only if the participants speak the same language.[8]

I do not know whether the interbranch dialogue that I describe actually occurs in practice, or if it is unrealistic to imagine that the legislature itself uses the rules of construction to guide its drafting process. Even if it occurs, such a dialogue would not result in the elimination of ambiguity, or anything close to that. Ambiguities are inevitable for a combination of reasons, including the intrinsic nature of language that makes ambiguity impossible to stamp out; the inevitability of imprecise drafting caused by carelessness, time pressure, or other such factors; the need or desire of the legislature to draft a statute using open textured language; the impossibility of foreseeing every possible set of circum-

---

[8] The idea of statutory construction as an "interbranch dialogue" is well known and much debated. A leading law review article notes that "much interpretive theory and doctrine" in the field of statutory interpretation are based on the existence of an ongoing "dialogue between courts and Congress," in which there is "some congressional awareness and responsiveness to the rules [of construction] that courts employ." A. Gluck & L. Bressman, "Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I," 65 Stan. L. Rev. 901, 917 (2013). The Gluck and Bressman article contains empirical evidence indicating that, at least at the federal level, the individuals who actually draft the statutes enacted by Congress either do not know or do not care about many of the most important rules of construction that courts use to interpret those statutes. See id., 907 ("[T]here were a host of canons that our respondents told us that they do not use, either because they were unaware that the courts relied on them or despite known judicial reliance. For example, our respondents were mostly unaware of and do not use 'clear statement rules' . . . . [O]ur respondents [also] told us that they . . . do not generally draft in accordance with the rule against superfluities, that they do not consult dictionaries when drafting, and that legislative history remains a critical tool regardless of whether courts use it." (Emphasis omitted.)). Small wonder that, for these and other reasons, some commentators doubt whether the concept or practice of interbranch dialogue holds any promise for improving the work that courts do with respect to statutory construction. See, e.g., J Brudney & E. Leib, "Statutory Interpretation as 'Interbranch Dialogue'?," 66 UCLA L. Rev. 346, 352–61 (2019).

stances that a litigant may later claim comes within the scope of a statute; and the fact that the legislature sometimes will deliberately use ambiguous language to cover over or defer resolution of a disputed area of application. See, e.g., J. Landau, "Oregon Statutory Construction," 97 Or. L. Rev. 583, 616 (2019) ("A statute may be ambiguous for any number of reasons—whether lexical, syntactical, referential, semantic, or vague in the linguistic sense. The courts refer to all of those different forms of indeterminacy as 'ambiguity.' "); J. Shobe, "Intertemporal Statutory Interpretation and the Evolution of Legislative Drafting," 114 Colum. L. Rev. 807, 866 (2014) (describing three types of ambiguity found in statutes, namely, strategic, avoidable unintentional, and dynamic ambiguity).

It seems obvious that the ambiguity found in § 12-63c was unintentional and easily could have been avoided. That is no sin, of course, and I am not complaining. Indeed, my point is not at all that the legislature could or should have expressed itself more clearly by saying either that the required information must be received by the assessor by June 1, or that it must be postmarked by that date. My point, rather, is directed at those of us whose task it is to interpret statutes. In my view, if the Judicial Branch hopes to engage in a successful dialogue with the Legislative Branch about statutory construction, then judges must express themselves in frank and direct language. If the relevant rules of construction, properly applied, should lead us to conclude that a statute is ambiguous, then it is important that we do not rescue the statute from that condition. Otherwise, the legislature will not know that something more is needed if it wishes to achieve "plain meaning."

My second concern relates to a particular feature of § 1-2z that can be seen in operation in the present case. The point begins with the uncontroversial observation

Seramonte Associates, LLC *v.* Hamden

that the interpretive methodology under § 1-2z requires a singular and exclusive focus on the question of statutory ambiguity as a threshold inquiry. See, e.g., *Heim* v. *Zoning Board of Appeals*, 289 Conn. 709, 716 n.7, 960 A.2d 1018 (2008) ("§ 1-2z requires a threshold determination whether the [statute] is ambiguous"); *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 742 n.4, 865 A.2d 428 (2005) ("[t]he legislature enacted [§ 1-2z] in response to our decision in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003), and we have recognized that this [statute] has legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text" (internal quotation marks omitted)). If there is no ambiguity, the inquiry is at an end, and the court may use no other tools of construction to discern legislative intention, unless the textual analysis triggers the narrow exception when the unambiguous meaning yields absurd or unworkable results.[9] The majority opinion in this case proceeds in accordance with this prescribed framework.

I have no criticism whatsoever of placing the statutory text at the dead center of the work of statutory construction. It has always belonged there, and still does. We are all textualists now, as Justice Elena Kagan has famously observed,[10] and the statutory text (and its immediate context) is, without any doubt, the most important consideration for the task of interpretation. But I believe that there is a very real risk that the exclusive and blindered threshold focus on linguistic ambiguity mandated by §1-2z can—and sometimes

[9] I express no view as to whether a legislative directive of this nature violates the constitutional separation of powers.

[10] See, e.g., B. Kavanaugh, Book Review, "Fixing Statutory Interpretation," 129 Harv. L. Rev. 2118, 2118 and n.1 (2016).

Seramonte Associates, LLC *v.* Hamden

does—distract us from the fundamental question of legislative intention that must be answered by judges seeking "to say what the law is," which is what we do when we construe a statute. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803). Countless intelligent and experienced jurists have spent centuries developing a wide variety of tools for ascertaining the meaning of a statute when engaged in the work of statutory construction. Some of those rules are more useful than others, their utility must regularly be reassessed and readjusted as necessary, and all of the rules (including the textualist's preference for dictionaries) must always be applied with care and in good faith to avoid mistake or mischief. But the aids to construction in our judicial toolbox collectively represent a valuable legacy, and it is no small wonder that § 1-2z did not quite manage to distill the wisdom of the ages into its two sentence mandate.[11]

In any event, the present case demonstrates one certain thing about the enterprise of statutory construction, which is that considerations of public policy will always find a way into the analysis. If the goal of § 1-2z is to require judges to employ a method of interpretation that would prevent them from using their toolbox of rules, whether deliberately or not, to "legislate from the bench" under the guise of statutory construction,[12] that objective has failed and was doomed from the outset to fail. Without reference to § 1-2z, every judge I know tries very hard to avoid allowing his or her own subjective policy preference to influence his or her construction of a statute. But if judges consciously

---

[11] Indeed, § 1-2z itself failed to express itself in plain and unambiguous terms. See *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 498, 923 A.2d 657 (2007) (concluding that "the word 'text,' " as used in § 1-2z, is not plain and unambiguous).

[12] See, e.g., *State* v. *Courchesne*, supra, 262 Conn. 627 (*Zarella, J.*, dissenting) ("[i]ndeed, a court's disregard of the plain meaning of a legislature's enactments amounts to little more than judicial lawmaking").

or unconsciously are motivated to graft their policy preferences onto the text of a statute, nothing in § 1- 2z will prevent them from doing so, or even perceptibly mitigate the risk. The statute merely moves the field of play by shifting the interpretive action to the threshold ambiguity inquiry. Why? Because the ambiguity deter- mination is open to the same subjective forces as any other interpretive practice. United States Supreme Court Justice Brett Kavanaugh has explained: "One judge's clarity is another judge's ambiguity. It is difficult for judges (or anyone else) to [determine the level of ambiguity in a given piece of legislation] in a neutral, impartial, and predictable fashion." B. Kavanaugh, Book Review, "Fixing Statutory Interpretation," 129 Harv. L. Rev. 2118, 2137 (2016); see, e.g., W. Farnsworth et al., "Ambiguity About Ambiguity: An Empirical Inquiry into Legal Interpretation," 2 J. Legal Analysis 257, 276 (2010) ("Some judges read the text and say that it just seems clear. Other judges read the same text and say that it just doesn't. These disputes are difficult to resolve because . . . there are no legal standards that quite bear on them, and no way to falsify a judge's claim one way or the other.").

For this reason, subjective policy preferences inevita- bly color the analysis. See W. Farnsworth et al., supra, 2 J. Legal Analysis 271 ("[w]hen respondents are asked how ambiguous a statute seems or whether two pro- posed readings of it are plausible, their judgments about the answers tend to follow the strength of their prefer- ences about the outcome as a matter of policy: the more strongly they prefer one reading over the other, the more likely they are to say that the statute is unambigu- ous or that only one reading of the text is plausible"). Justice Kavanaugh puts the point directly: "Because judgments about clarity versus ambiguity turn on little more than a judge's instincts, it is harder for judges to ensure that they are separating their policy views from

Seramonte Associates, LLC *v.* Hamden

what the law requires of them. And it's not simply a matter of judges trying hard enough: policy preferences can seep into ambiguity determinations in subconscious ways. As a practical matter, judges don't make the clarity versus ambiguity determination behind a veil of ignorance; statutory interpretation issues are all briefed at the same stage of the proceeding, so a judge who decides to open the ambiguity door already knows what he or she will find behind it." (Footnotes omitted.) B. Kavanaugh, supra, 129 Harv. L. Rev. 2138–39.

My point is cautionary in nature and not as ambitious as the foregoing observations may imply. The task of statutory construction is often difficult, and the tools we use to discern the true meaning of legislation, as applied to any particular set of circumstances, are not guaranteed to result in a clear and incontestable result. Perhaps, hopefully, there is an ongoing interbranch dialogue that establishes and reinforces a set of interpretive conventions that will help judges construe statutes in accordance with legislative intent. But, even under optimal conditions, many statutes contain ambiguities, and sometimes those ambiguities are not easy to resolve. Section 1-2z has not removed our ability to resort to the tools of construction needed to construe statutes, as required in any particular case, and I am confident that we will continue to use those tools, as necessary and appropriate, with care and good judgment, in the faithful execution of our constitutional duties.

Accordingly, I respectfully concur in the judgment.